A95A0671. HARMON et al. v. CITY OF COLLEGE PARK et al.
(460 SE2d 554)

Blackburn, Judge.

On September 5, 1992, Carolyn Delores Harmon (decedent) drowned and was survived by her children, Reginald Bryan and Antonio Deon Harmon. Mattie Harmon, as administratrix applicant of the decedent's estate and as guardian and next friend of the children, appellants/plaintiffs, commenced the underlying wrongful death action against the City of College Park (City) and Paul and Marlene T. Pichon. The appellees denied the material allegations of the complaint and moved for summary judgment. The trial court entered an order granting partial summary judgment on the motions because the decedent "assumed the risk of drowning, failed to exercise ordinary care for her own safety, and was, by her conduct the proximate cause of her own drowning."

The evidence indicates that it had been raining heavily in the College Park area throughout the day and evening of September 4, 1992. Rainfall had been so heavy that the creek[1] which separated the Villa Nieves Apartments from the tenant parking lot on Harvard Avenue had overflowed its banks and flooded adjacent areas. By midnight, flood waters had reached the handrail level on the concrete footbridge connecting the apartments to the parking lot.

At about midnight, the decedent decided to go to Nathaniel and Nettie Robinson's apartment. She traversed the concrete footbridge which brought her to the front side of the apartment building at the end of the building directly abutting the creek. A straight, rear sidewalk ran parallel to the length of the apartment building, getting progressively closer to the creek before terminating on Harvard Avenue immediately to the left of the drainage culverts which ran under it. These culverts were a short, straight-line distance downstream from the footbridge and visible from it.

At the decedent's request, Dennis Williams, another tenant of the apartments assisted the decedent as she crossed the footbridge by holding her arm. The water was up to the decedent's waist as she crossed the bridge. Nathaniel Robinson watched the two from his apartment as they came across and heard them observe that they needed to exercise care as the water was high and moving quickly.

After arriving at the Robinsons' apartment, the decedent declined the Robinsons' offer to stay with them until it was over and expressed a desire to go to Melvin Blalock's apartment, immediately saying to Blalock, "Come on. I got to go do my hair." The decedent was in the apartment ten to fifteen minutes but never sat down, ig-

---

[1] The City's water drainage system consists of naturally occurring and manmade features. The creek here involved is a naturally occurring component of such system.

noring Blalock's admonition to "chill out . . . it's kind of bad out there."

The decedent departed the Robinsons' apartment by the back door because of the difficulty she had experienced on the footbridge. Nettie Robinson deposed that "[the decedent] walked right into [the waters]," evidencing that she knew the rear sidewalk was there. With Blalock behind her, she led the way down the sidewalk towards Harvard Avenue, beyond which was Blalock's apartment. The decedent and Blalock moved hurriedly in water up to their waists. Neither used the chain link fence along the left side of the sidewalk to stabilize themselves. When they got beyond the end of the apartment building, light was sufficient for them to see the apartments across the street and the rapidly moving water in the vicinity of the drainage culverts. Waist-high waters, however, prevented them from observing the creek bed to the right of the sidewalk or other ground features.

As they neared Harvard Avenue, Blalock saw the decedent appear to veer to the right towards a whirlpool where the creek bed converged with three 48-inch drainage culverts running under Harvard Avenue. The decedent got caught in the whirlpool and disappeared under the water's surface. Her body was never recovered.

Appellants contend that the trial court erred in granting the motions for summary judgment. In particular, they argue that the evidence of record establishes jury questions as to decedent's status as a licensee, whether she exercised ordinary care for her own safety, whether she assumed the risk that resulted in her death, and whether her alleged failure to exercise ordinary care for her own safety proximately caused said death.

"We recognize the long-standing rule that issues of negligence and lack of ordinary care for one's own safety are rarely appropriate matters for summary adjudication. Nonetheless, in certain instances, such as this, the trial court can conclude as a matter of law that plain, palpable and undisputed evidence establishes that plaintiff assumed the risk[2] of her [death]. [Cit.]" *Hackel v. Bartell*, 207 Ga. App. 563, 564 (428 SE2d 584) (1993). "The danger of drowning in water is a palpable and manifest peril, the knowledge of which is chargeable to the decedent . . . in the absence of a showing of want of ordinary capacity." *Bourn v. Herring*, 225 Ga. 67, 69 (166 SE2d 89) (1969).

The trial court's order states "[a] large body of rapidly moving

---

[2] " '[T]he doctrine of the assumption of the risk of danger applies only where the plaintiff, with a full appreciation of the danger involved and without restriction from his freedom of choice either by the circumstances or by coercion, deliberately chooses an obviously perilous course of conduct so that it can be said as a matter of law he has assumed all risk of injury.' (Citations, punctuation and emphasis omitted.) *Moore v. Svc. Merchandise Co.*, 200 Ga. App. 463, 464 (408 SE2d 480) (1991)." *Union Camp Corp. v. Dukes*, 217 Ga. App. 95, 97 (456 SE2d 645) (1995).

water constitutes a clear and obvious dangerous condition. The dangers of walking through waist high water, which is rapidly moving near or into a drainage ditch, all without the benefit of being able to see ground features, when such action is undertaken by an individual suffering no deficiencies in capacity, all combine to present a clear and obvious case, as a matter of law, of an individual not exercising ordinary care for her own safety." Moreover, the decedent was a person who could not have been other than thoroughly familiar with the area. She had used the footbridge before and at night, having visited the Robinsons at least ten times and Blalock "every three days" for two years while he was a tenant in the apartment complex. Neither would she have stepped unhesitatingly into the waters behind the Robinsons' apartment had she not been familiar with the sidewalk running behind the building which was underwater and out-of-sight.

Immediately after the accident occurred, another resident of the apartments used the sidewalk to inspect the drowning scene. He deposed that he held on to the fence for the length of the sidewalk out of caution because "you can look over and see how fast the water is going. I'm not going in there if I can help it." Nothing in the record suggests that the decedent should have been any less aware of the danger and concerned for her safety.

Pretermitting the decedent's claims of negligence and nuisance as to the City and negligence as to the Pichons, where an intervening act is established as the proximate cause of injury or death, a valid defense arises in the defendant as a matter of law. *Bartel*, supra at 564. Accordingly, we find that the trial court properly granted the motions for summary judgment.

*Judgment affirmed. Beasley, C. J., Birdsong, P. J., Pope, P. J., Andrews, Johnson, Smith and Ruffin, JJ., concur. McMurray, P. J., dissents.*

McMURRAY, Presiding Judge, dissenting.

I respectfully dissent as it is my view that the case sub judice is not one of those rare instances where the trial court may side-step a jury and resolve issues of negligence, contributory negligence or assumption of the risk as a matter of law. Further, it is my view that the majority erroneously adopts the trial court's construction of proof and thereby fails to adhere to the requirement that, upon summary adjudication, the evidence must be viewed in a light which most favorably supports an opposing party's claims. *Salmon v. Pearson & Assoc.*, 214 Ga. App. 11 (446 SE2d 762). To this extent, there is no conclusive testimony which authorizes the trial court's finding that Carolyn Harmon knowingly stepped into "water, which [was] rapidly moving near or into a drainage ditch. . . ." In fact, it is my view the same eyewitness testimony which appears to be the basis of this find-

ing of fact would more likely authorize a finding that Carolyn Harmon slipped from an area of still waters and fell into a submerged drainage ditch while she was negotiating one of only two paths of egress (sidewalks) along the edge of the flood zone.

" ' "(Q)uestions of negligence, diligence, contributory negligence, and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in solving them, except in plain and indisputable cases." (Cit.) Added to that list are related issues of assumption of risk, lack of ordinary care for one's safety, lack of ordinary care in failing to foresee a condition which could cause injury (cit.), and even where there is no dispute as to the facts, it is usually for the jury to say whether the conduct in question met the standard of the reasonable man. (Cit.) "Unless no other conclusion is permissible, questions of negligence are matters for jury resolution and are not ordinarily susceptible to summary adjudication." (Cit.)' *Cunningham v. Nat. Svc. Indus.*, 174 Ga. App. 832, 836 (331 SE2d 899) (1985)." *Showalter v. Villa Prado Assoc.*, 182 Ga. App. 705 (356 SE2d 895).

In the case sub judice, the trial court found that genuine issues of material fact remain as to the City of College Park's responsibility for maintaining a nuisance over the Pichons' property, and to this extent, there is proof that the City of College Park and the Pichons were aware, long before Carolyn Harmon's death, of the drainage defects and the resulting flash flooding and whirlpool which dragged the victim to an unknown watery grave. Further, there are indications that neither the City of College Park nor the Pichons did anything to remedy the danger before the drowning, foisting responsibility for the hazard by insisting that the burden of curing the defect rested with the opposite party.[3] In either case, there is no question that genuine issues of material fact remain as to the liability of both the City of College Park and the Pichons for failing to abate the alleged nuisance. See *Town of Fort Oglethorpe v. Phillips*, 224 Ga. 834, 838 (165 SE2d 141); OCGA § 51-3-1.[4] Nonetheless, the trial court pretermitted issues relating to any wrongdoing on the part of defendants, finding (*as a matter of law*) that Carolyn Harmon's action in traversing "a body of rapidly moving waist high water" was the sole proximate cause of her

---

[3] It would thus not be unreasonable (for a jury) to conclude that the cost and burden of curing the alleged nuisance sounded much louder to the City of College Park and the Pichons than ongoing complaints of residents who had been victimized by recurrent episodes of flash flooding in the area where Carolyn Harmon died.

[4] The trial court also concluded (as a matter of law) that Carolyn Harmon was a licensee on the Pichons' property at the time of her death. I do not believe such a conclusion is demanded by the evidence. On the contrary, it appears to be undisputed that Ms. Harmon was invited as a guest by one of the landlords' tenants just before the fatal incident, thus placing her within the status of invitee with regard to measuring the Pichons' liability. *Moon v. Homeowners' Assn. of Sibley Forest*, 202 Ga. App. 821, 822 (2) (415 SE2d 654).

death.

" '(I)t is a plaintiff's knowledge of the *specific hazard* which precipitates the slip and fall which is determinative, not merely his knowledge of the generally prevailing hazardous conditions or of the hazardous conditions which he observes and avoids.' *Telligman v. Monumental Properties*, 161 Ga. App. 13, 16 (288 SE2d 846) (1982). See also *Nicholson v. MARTA*, 179 Ga. App. 173, 175 (345 SE2d 679) (1986); *Burkhead v. American Legion*, 175 Ga. App. 56, 57 (332 SE2d 311) (1985); *Sears, Roebuck & Co. v. Reid*, 132 Ga. App. 136, 138 (207 SE2d 532) (1974)." (Emphasis supplied.) *Showalter v. Villa Prado Assoc.*, 182 Ga. App. 705, 706, supra. In the case sub judice, there is no dispositive proof that Carolyn Harmon was familiar with the specific area she was traversing at the time of her death, and it appears to be undisputed that the drainage ditch into which she fell was concealed by flood waters at the time of the fatal incident. Indeed, while Carolyn Harmon was obviously aware that she was walking through waist-high water before her death, I do not think that it can be said (*as a matter of law*) that Ms. Harmon was aware of just how precariously close the submerged drainage ditch was to the sidewalk she was traversing moments before her death.[5] Further, while Carolyn Harmon had crossed the strong currents of the drainage ditch earlier in the evening before her death, there is no indication that she had ever before traversed the pooled waters in the area near where she drowned. Moreover, at the time Carolyn Harmon crossed the footbridge with her companion, the terrain was different and the scene presented flooding conditions (i.e., rapidly flowing water) which appeared to be far more dangerous than the still waters of the alternative route chosen by the decedent and her companion. Most persuasively, however, is the absence of proof that Carolyn Harmon was aware of the powerful suction at the narrow drain pipes which ultimately dragged the victim underwater and jettisoned her body to some obscure location within the City's sewer system. Under these circumstances, I cannot go along with the majority in saying that the evidence demands a finding that Carolyn Harmon had a full appreciation of the specific danger which caused her death or that Ms. Harmon, in the exercise of ordinary care, should have avoided any at-

---

[5] The majority points out that Ms. Harmon and her companion failed to hold onto the chain link fence along the left side of the sidewalk in apparent support of the view that the victim failed to exercise ordinary care for her own safety. This is good advocacy, but like most evidentiary arguments, there almost always remains more than one reasonable perspective. For example, it can just as persuasively be asserted that locating the fence on the opposite side of the sidewalk from the drainage ditch did nothing to protect pedestrians from falling into a hazardous area and even blocked any possible chance of giving the dangerous canal a wide berth during conditions of flash flooding, thereby constituting a hard element of the alleged nuisance.

tempt to escape the flood which separated the victim from her companion's home. It is my view that any such conclusions are for a jury.

DECIDED JULY 12, 1995 —
RECONSIDERATION DENIED JULY 26, 1995 — 

*Bauer, Deitch & Raines, Henry R. Bauer, Jr., Gilbert H. Deitch,* for appellants.

*Swift, Currie, McGhee & Hiers, John W. Campbell, Jenkins & Eells, Kirk R. Fjelstul,* for appellees.