## A02A1946. BREYNE et al. v. POTTER et al.
(574 SE2d 916)

BARNES, Judge.

Linda Breyne and John Sekula sued Phillip L. Potter, M.D., for medical malpractice and breach of fiduciary duties, and sued Maternal Fetal Diagnostic Center of Atlanta, Inc. as Dr. Potter's principal. The defendants answered and moved for summary judgment, which the trial court granted without explanation. The plaintiffs appealed, and for the reasons that follow, we reverse the grant of summary judgment against Breyne, but affirm the grant against Sekula.

The facts in this case are not in dispute. When she became pregnant at age 40, Breyne was referred to Dr. Phillip Potter and the Maternal Fetal Diagnostic Center of Atlanta due to concerns about possible birth defects due to her age and recent antibiotic use. After Breyne and Sekula, the baby's father, received genetic counseling, Breyne decided to undergo chromosome testing. Dr. Potter withdrew a small sample of placental cells from Breyne and had it tested for genetic abnormalities.

Dr. Potter subsequently received a note from his receptionist regarding the test results and told Breyne over the phone on a Friday that her fetus had the genetic abnormality trisomy 21, or Down's syndrome. In response to Breyne's questioning, Dr. Potter assured Breyne that the test was accurate, that there was no need for additional testing to verify the test results, and that the lab understood the significance and importance of the test.

Breyne and Sekula talked to Dr. Potter in person the following Monday, and during that conversation, Dr. Potter reiterated that the lab test showed that Breyne's baby had Down's syndrome. He said that, if Breyne were going to terminate the pregnancy, it was better to do so sooner rather than later. When Breyne told him that she had decided to terminate the pregnancy, Dr. Potter called her HMO, told the doctor there of her decision, and scheduled the procedure.

Two days later, Breyne terminated the pregnancy. The day after the termination, Dr. Potter called and "clarified" that the test results did not show Down's syndrome, but another chromosomal abnormality known as Triple X or 47 XXX. Dr. Potter told Breyne that "the results were the same [as with Down's syndrome], a severely mentally retarded child."

While the results were correctly written as 47 XXX in both the telephone message and a faxed report Dr. Potter received before talking to Breyne and Sekula on Monday, Dr. Potter somehow misread them. The lab report noted, in contrast to Dr. Potter's explanation to Breyne, that the clinical manifestations of children with Triple X "are highly variable and precise predictions about an individual's prognosis are not possible. Mental retardation is not expected but

there is a risk for developmental delays in speech, neuromotor skills and learning abilities. Physical phenotype and fertility are usually normal."

The parties disagree on the application of these facts to the law. Dr. Potter contended in his motion for summary judgment that Breyne was seeking damages for wrongful death and argued that (1) Georgia law provides no cause of action for Breyne's damages, and (2) Breyne's choice, not Dr. Potter's error, was the proximate cause of the pregnancy termination.

1. No cause of action exists for the wrongful death of an unborn child who was not "quick" or viable at the time he died. *Citron v. Ghaffari*, 246 Ga. App. 826, 828 (1) (542 SE2d 555) (2000). " 'The concept of "quickening" is defined as that point in time when the fetus "is able to move in its mother's womb," . . . generally . . . sometime between the tenth week and the fourth month of pregnancy.' " Id. A review of the complaint in this case, however, reveals that the plaintiffs have not stated a wrongful death claim, but instead have alleged that they suffered damages as a result of Dr. Potter's medical malpractice and breach of fiduciary duty. Therefore, Dr. Potter was not entitled to summary judgment on this ground.

2. OCGA § 9-3-70 (1) provides that "the term 'action for medical malpractice' means any claim for damages resulting from the . . . injury to any person arising out of . . . diagnosis . . . or care rendered by a person authorized by law to perform such service." OCGA § 51-1-27 provides that "[a] person professing to practice . . . the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." To impose liability for medical malpractice, a plaintiff must show three things: "(1) the duty inherent in a professional-patient relationship; (2) breach of that duty by deviating from the appropriate standard of care; and (3) a showing that the failure to exercise the requisite degree of skill is the proximate cause of the injury sustained." *McQuaig v. McLaughlin*, 211 Ga. App. 723, 724 (1) (440 SE2d 499) (1994).

The plaintiffs' expert testified by affidavit that a physician should carefully read a written report generated as a result of the kind of genetic testing that Breyne underwent and should accurately counsel the patient before she makes an irrevocable decision. In his opinion,

> Dr. Potter deviated from the standards of care as I have outlined them herein, by failing to carefully read the report and by failing to accurately counsel Ms. Breyne concerning the findings, and that because he deviated from the standards of

care as I have outlined them herein, Ms. Breyne did not receive appropriate information to make an informed decision, and underwent an unnecessary and unwanted abortion.

Dr. Potter is board-certified in obstetrics and maternal-fetal medicine. While he testified that he was merely "a technician who obtained a sample" and was not involved with Breyne "for purposes of giving her information," he also testified that his practice is focused on prenatal diagnostic procedures and he admitted that he erroneously told her that the test showed she was carrying a Down's syndrome baby. A physician must exercise the same degree of care and skill in making a diagnosis as is required in treatment. *Mull v. Emory Univ.*, 114 Ga. App. 63, 64 (4) (150 SE2d 276) (1966). Dr. Potter admitted that he misdiagnosed Breyne, and Breyne has thus presented genuine issues of material fact concerning Dr. Potter's duty to her and his breach of that duty.

3. Breyne also argues that Dr. Potter is not entitled to summary judgment on whether his malpractice proximately caused her damages, because the record contains evidence in the form of her deposition testimony that she relied on his erroneous diagnosis to her detriment. Breyne testified that she and Sekula discussed the fact that, as older parents, they might not be able to care properly for this person who would be mentally retarded to some degree and could not live alone.

Dr. Potter contends that the plaintiffs "decided on their own" to terminate the pregnancy, and that the "fetus was not injured or did not die from Dr. Potter's negligence. Rather, Appellants' fetus died from an independent and affirmative choice made by Appellants."

In support of this argument, Dr. Potter misstates this Court's analysis in *Roseberry v. Brooks*, 218 Ga. App. 202, 205-208 (1) (461 SE2d 262) (1995), an appeal of a judgment on a jury verdict. In the first place, the pertinent Division in *Roseberry* concerned the plaintiff's claim for wrongful death damages, and the plaintiffs in this case have not brought a wrongful death claim. Further, this Court in *Roseberry* did not hold that the decision to terminate a pregnancy was the proximate intervening cause of the plaintiff's damages, so that the defendant doctor was not liable for his malpractice. The Court held that the plaintiff's decision was based on two reasons: (1) the doctor's misdiagnosis that the fetus was "doomed," and (2) the mother's desire to receive experimental cancer treatment, for which she would not be accepted if she were pregnant. Id. at 207. Because death is incapable of any reasonable or practical division, we held that the termination performed for the purpose of obtaining experimental treatment was an intervening act that superseded any medi-

cal negligence by the defendant doctor that also caused the mother to terminate the pregnancy. Id. *Roseberry* does not stand for the proposition that a patient's decision to terminate a pregnancy breaks the chain of proximate cause following a doctor's erroneous diagnosis on which the patient relied in making that decision.

Under Dr. Potter's theory, a patient who had her breast amputated unnecessarily after her doctor mistakenly told her she had cancer would have no malpractice claim, because the ultimate decision to proceed with the surgery lay with the patient. Patients are entitled to rely on their doctors' diagnoses in deciding a course of treatment. *Stephen W. Brown Radiology Assoc. v. Gowers*, 157 Ga. App. 770, 773 (1) (278 SE2d 653) (1981). If a doctor breaches the standard of care in making that diagnosis, a patient who suffers damages as a result may have a cause of action.

In this case, while there are indications in the record that Breyne may have considered terminating her pregnancy before seeing Dr. Potter, she testified that the only reason she decided to end the pregnancy was because she was worried about the future of a Down's syndrome child with parents of their age. Thus, the record contains evidence raising genuine issues of material fact regarding Dr. Potter's duty to Breyne, a breach of that duty, and proximate cause in this medical malpractice action.

4. While Dr. Potter concedes in his brief that he owed a fiduciary duty to Breyne, he also argues that her decision to terminate her pregnancy severed the causal link between breach and damages. As discussed previously, however, the evidence raises a genuine issue of material fact regarding whether Breyne made that decision based on Dr. Potter's erroneous diagnosis. The trial court erred in granting summary judgment to the defendant on Breyne's claim for breach of fiduciary duty.

5. Dr. Potter also briefly argues that Breyne cannot show physical injury and therefore cannot claim emotional damages. While emotional distress is not an element of damages in a wrongful death action, Breyne "may bring a claim based on malpractice resulting in injuries to her person. This claim may include a claim for compensation for any emotional distress which is a consequential damage resulting from those injuries. [Cit.]" *OB-GYN Assoc. v. Littleton*, 261 Ga. 664 (410 SE2d 121) (1991). In that case, involving a malpractice claim alleging that a doctor failed to deliver by cesarean section a full-term baby that died shortly after a vaginal delivery, the Supreme Court affirmed this Court's opinion in *Littleton v. OB-GYN Assoc.*, 199 Ga. App. 44 (403 SE2d 837) (1991), in which we held:

[T]he professional negligence alleged is not that the medical procedures used were improperly performed, but that they

were inappropriate under the circumstances. Professional medical negligence may consist of negligent diagnosis resulting in properly performed but inappropriate treatment, as well as a lack of skill or care in applying appropriate treatment.

Id. at 45-46. Evidence that the plaintiff received an injection of medication to strengthen her contractions and subsequently experienced intense labor pain was "sufficient to create a genuine issue of fact as to whether she suffered a physical injury as a result of the alleged negligence." Id. at 46. In this case, evidence that Breyne underwent a procedure to terminate her pregnancy is sufficient to create a genuine issue of fact as to whether she suffered a physical injury and emotional distress resulting from that injury.

The Supreme Court went even further in *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583, 588 (533 SE2d 82) (2000), holding that

When, as here, a parent and child sustain a direct physical impact and physical injuries through the negligence of another, and the child dies as the result of such negligence, the parent may attempt to recover for serious emotional distress from witnessing the child's suffering and death without regard to whether the emotional trauma arises out of the physical injury to the parent.

Further, because the fetus was not viable when the pregnancy was terminated, under our law it was still considered part of the mother and not a separate person. Many facets of Georgia law, from wrongful death torts to criminal statutes, recognize this distinction. OCGA § 16-5-80 defines the offense of feticide as wilfully killing "an unborn child so far developed as to be ordinarily called 'quick' by any injury to the mother of such child, which would be murder if it resulted in the death of such mother." See *Powell v. Augusta &c. R. Co.*, 77 Ga. 192, 199 (3 SE 757) (1887) (if an injury results in a miscarriage, evidence as to its effect on the mother's future health and "nervous system" is admissible); *Gulf Life Ins. Co. v. Brown*, 181 Ga. App. 72, 73 (351 SE2d 267) (1986) (physical precedent only) (*Powell* acknowledged existence of cause of action for injuries due to a miscarriage). Therefore, an injury to Breyne's fetus could constitute an injury to Breyne, and the existence of physical and emotional damages that flowed from such an injury is an issue for a jury to consider.

Thus, the record contains evidence raising genuine issues of material fact regarding Breyne's allegations of physical injury and consequent mental suffering. The trial court erred in granting summary judgment to Dr. Potter against Breyne on her malpractice claim against him.

6. As to Sekula, he was not Dr. Potter's patient, nor was he married to Breyne. Therefore, no evidence in the record establishes that Sekula has met the first requirement for imposing liability for medical malpractice, which is to establish that Dr. Potter had a duty to him. *Cannon v. Jeffries*, 250 Ga. App. 371, 372 (1) (551 SE2d 777) (2001). Sekula cannot show he is entitled to damages for loss of consortium. See *W. J. Bremer Co. v. Graham*, 169 Ga. App. 115, 117 (312 SE2d 806) (1983). Finally, for the reasons discussed in Division 1, Sekula does not have a cause of action for wrongful death as the father. Therefore, the trial court did not err in granting summary judgment to Dr. Potter on Sekula's claims against him.

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Pope, Senior Appellate Judge, concur.*

DECIDED DECEMBER 5, 2002.

*Webb, Lindsey, Collins, Jones & Wade, James H. Webb, Jr., Jonathan J. Wade, Hall, Booth, Smith & Slover, Martin C. Jones*, for appellants.

*Carlock, Copeland, Semler & Stair, Alwyn R. Fredericks*, for appellees.