**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 15, 2024**

# In the Court of Appeals of Georgia

A23A1715. FERGUSON et al. v. BOWERS et al.

DOYLE, Presiding Judge.

Following the death of Elzabad H. Ferguson III ("Chaz"), his parents, Elzabad H. Ferguson, Jr. and Wilhelmena Ferguson, brought this action against Blaire Bowers, D.O.; Steven Currier, M.D.; and Augusta Physicians Group, LLC, based on emergency mental health care they rendered to Chaz. Shortly after the defendants discharged Chaz to his parents, he fled from them and was found three days later having accidentally drowned. The trial court granted summary judgment to the defendants, holding that any alleged negligence was not the proximate cause of Chaz's death. We agree and affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.

In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling[,] and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. In doing so, we bear in mind that the party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact.[1]

Viewed in the light most favorable to the Fergusons, the record shows that they lived in Chattanooga, Tennessee, with their 27-year-old son, Chaz. Chaz had been diagnosed with schizophrenia, bipolar disorder, and oppositional defiance disorder; he was under the care of doctors and had been prescribed medication. Although Chaz could be paranoid and delusional, he was not suicidal or violent.[2]

In July 2020, Chaz and his father traveled to North Carolina to visit family. According to his father, Chaz had stopped taking his medicine approximately one or two weeks before the visit, and he began to show signs of a worsening mental condition. One night, he told his father he was going for a walk and disappeared for

---

[1] (Citations and punctuation omitted.) *Evans v. Med. Center of Central Ga.*, 359 Ga. App. 797, 797 (860 SE2d 100) (2021).

[2] It does not appear that Chaz was subject to a legal guardianship.

several hours before ending up at a stranger's door several miles away, claiming that he had been kidnapped. Police who responded to the kidnapping call returned Chaz to his father, who encouraged Chaz to take his medication, believing he did so on three occasions over the next two days, although his father did not see whether Chaz actually swallowed the pills at that time.

They remained in North Carolina the following day before beginning the drive home to Chattanooga on Monday July 13, 2020. On the drive home, just after they passed Augusta, Georgia, Chaz told his father that his stomach was bothering him and asked him to stop the car. After the father pulled over, Chaz got out of the car, walked away, and jumped a fence. When Chaz failed to return within half an hour, his father called 911. Chaz was subsequently found naked and barefoot at a construction site two miles away.

Chaz was taken by ambulance to a hospital in Augusta for a psychiatric evaluation. Upon arrival, Chaz ran from the medical staff, but he was located in the parking lot, restrained, and returned to the emergency room. Dr. Blaire Bowers saw Chaz in the emergency room, but Chaz would not answer any of her questions. Dr.

Bowers placed Chaz on an involuntary "1013 hold"[3] due to his acute psychosis and ordered a behavioral health consultation and chemically restrained him.[4] Counselor Charlene Moore-Peterson assessed Chaz and believed he met the criteria for in-

---

[3] According to the trial court's order:

> The procedure commonly referred to as a "1013" is governed by [OCGA § 37-3-41 et seq]. The procedure applies to individuals who present a substantial risk of imminent harm to himself, herself or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to that person or other persons; or who is so unable to care for that person's own physical health and safety as to create an imminently life-endangering crisis; and who is in need of involuntary inpatient treatment. It authorizes a 72-hour involuntary hold for those individuals that fit the criteria for inpatient treatment.

> It is called a "1013" because Form 1013 is completed by the assessing physician (or other health care professional). The form is at the Georgia Department of Behavioral Health & Developmental Disabilities (DBHDD) website.

[4] The hospital had no psychologists or in-patient mental health treatment facilities, so they used consultants from a nearby facility to assist with evaluating mental health patients and coordinating their care and placements.

patient treatment, and Dr. Bowers agreed. Accordingly, the plan was to find an in-patient facility for him. The next morning, Chaz's mother called the hospital and asked if Chaz could be admitted to a facility near his home, which was her preference, but she was told the hospital could not "cross state lines."

Attempts were made to find Chaz a placement, but the hospital was unable to find an inpatient facility that did not have a waiting list and could take him in the foreseeable future. The matter was complicated by the fact that Chaz was a Tennessee resident who did not have insurance.

On July 14, Chaz took off his clothes and fondled himself and refused to take all of his prescribed medication. He did, however, become more alert and oriented to place and time. Chaz took his medicine the morning of July 15, and was re-evaluated by Dr. Bowers, to whom he reported that he was having auditory hallucinations but confirmed that he had no thoughts of harming himself or anyone else. As a result, Dr. Bowers, in consultation with counselor Moore-Peterson and Dr. Currier (another emergency physician), believed the best course of action was to discharge him to his parents' care rather than hold him indefinitely in the emergency department, so they could take him back to Chattanooga where he could be seen by his doctor. . So, on July

15, 2020, Dr. Bowers ordered that Chaz be discharged the next day unless he became uncooperative and needed to be reevaluated.

In the early morning hours of July 16, 2020, Chaz took his second dose of medication, but refused the next dose at 11:00 a.m. While waiting for Chaz's parents to arrive, the nurse noted at 12:35 p.m. that Chaz refused instructions to remain in view, so within about five minutes she "moved him to another room that had a camera to assist with observing him," and to make him more comfortable.[5] After consulting with the overnight doctor that Chaz had not been disruptive overnight, Dr. Currier rescinded the involuntary hold based on Dr. Bower's determination from the day before that Chaz was stable enough to be released and posed no danger to himself or others. While Dr. Currier did not personally examine Chaz, he had communicated over the last three days with the team of doctors and nurses working with Chaz and had reviewed his medical chart for anything of concern.

---

[5] Dr. Bowers deposed that Chaz was moved to a less restrictive pod because he was more cooperative and did not need to occupy an emergency room bed. He was initially moved into "ER 74," a room that includes multiple recliners to acommodate more than one patient but lacked a camera. To better observe him, Chaz was moved within the same pod to "ER 72," a single room with a bed and camera.

Chaz's parents arrived at the hospital at around 2:00 p.m. on July 16, and his mother went in to bring him a change of clothes and retrieve him. Chaz's mother asked where she should go to request his medical records, and she was directed to a different building. They went back to the car, and Chaz's father drove them to the records building. Chaz and his mother went in the building to complete the paperwork before returning to the car. After buckling his seat belt, Chaz said "wait a sec." He then unbuckled himself, exited the car, and began walking back to the records department, and his father followed him. His father asked a security officer near the door for help, saying his son was "going to run." Meanwhile, his mother had caught up and also asked for help from a staff member, who indicated that they could not force someone to be admitted; as they stood with Chaz, the mother called the emergency department. She initially reached the discharge nurse who told her to bring him back, but she hung up when Chaz wandered out of the building. Chaz then returned back inside so she attempted two more calls to counselor Moore-Peterson, but she only reached voice mail.[6]

---

[6] Chaz's mother chose not to call the emergency department back because she was unhappy with the nurse's response and wanted to speak to Moore-Peterson; she never asked to speak to an available doctor.

Chaz again walked outside and turned to his father and asked, "why are you following me?" He then took off running toward a parking deck. The father called the sheriff's department, and deputies and hospital security searched the deck, but they were unable to find Chaz. The sheriff's department put out a missing persons alert; although a deputy encountered Chaz a few hours later on a trespassing call, the deputy did not detain him. Three days later, Chaz's body was discovered in a lake three miles away from the hospital. Following an autopsy, the death was ruled an accidental drowning.

The Fergusons filed a medical malpractice suit against the defendants.[7] The crux of the complaint is that the defendants were negligent in discharging Chaz without assessing or reassessing him on the date of discharge. In support of their complaint, the Fergusons obtained two medical experts — Dr. Martin Lutz and Dr. Tobias Wasser — who testified that the doctors breached the standard of care. Both doctors testified that Chaz should have been reassessed prior to his discharge. They opined that Chaz remained in an ongoing state of psychosis that rendered him incapable of caring for himself.

---

[7] The Fergusons also sued the hospital, but that defendant was voluntarily dismissed from the lawsuit.

The defendants moved for summary judgment based on the lack of proximate cause.[8] Following a hearing, the trial court granted the motion. The trial court found that the chain of causation was broken by both the remoteness in time and space between Chaz's discharge and his subsequent death and the deputy's failure to detain Chaz after he fled the hospital. The Fergusons now appeal.

Based on the undisputed facts of this case, the Fergusons' burden, in part, is to elicit evidence showing that the defendants' decision to discharge Chaz to his parents' care was the proximate cause of his accidental drowning death, which occurred miles away from the hospital at some point during the next three days.[9] In medical malpractice cases, expert testimony on causation is required.[10]

> Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the

---

[8] The defendants also moved to exclude the opinions of Dr. Lutz and Dr. Wasser. For purposes of summary judgment, the trial court assumed that the expert testimony was admissible.

[9] See *Miranda v. Fulton DeKalb Hosp. Auth.*, 284 Ga. App. 203, 206 (1) (644 SE2d 164) (2007) ("[T]he [plaintiffs] had the burden of proving at trial that appellees' negligence proximately caused the death . . . and that his death would not otherwise have occurred."). See also *Atlanta Obstetrics & Gynecology Group v. Coleman,* 260 Ga. 569, 599 (398 SE2d 16) (1990).

[10] See *Evans*, 359 Ga. App. at 800.

event would not have occurred. In this regard, a negligent actor who breaches a duty to another is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. It is important to recognize that "probable," in the rule as to causation, does not mean "more likely than not but rather not unlikely"; or, more definitely, "such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen." *The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery.* The determination of whether proximate cause exists requires both factfinding in the "what happened" sense, and an evaluation of whether the facts measure up to the legal standard set by precedent. And, while proximate cause is ordinarily a jury question, it will be determined by the court as a matter of law in plain and undisputed cases.[11]

---

[11] (Citations and punctuation omitted; emphasis supplied.) *Johnson v. Avis Rent A Car Systems, LLC*, 311 Ga. 588, 592-593 (858 SE2d 23) (2021).

"Jury questions on proximate cause do not exist simply because it may be 'possible' to connect a defendant's negligence to an otherwise unforeseen outcome, and to do so stretches the concept of proximate cause beyond its legal limits."[12]

Under the facts in this record, Chaz's accidental drowning at some point in the three days after his discharge is too remote to be the proximate result of his discharge. There is no evidence that Chaz's death was a result of suicide or violence, nor did Chaz have a history of self harm or violence. Instead, this case turns on expert testimony that despite the treatment and medication Chaz received in the hospital emergency department, he should not have been released to his parents, even with their consent.[13]

Nevertheless, as a matter of law, the record merely establishes "but for" causation or "cause in fact," which is only part of the plaintiffs' burden.[14] It is true in

---

[12] Id. at 596, n. 15.

[13] Chaz was an adult under no guardianship who did not need his parents' consent to be discharged from the hospital.

[14] See *Strength v. Lovett*, 311 Ga. App. 35, 43-44 (2) (b) (714 SE2d 723) (2011) ("To show that the wrongful conduct of the defendant is a cause in fact of his injuries, a plaintiff ordinarily must prove that, but for this conduct, he would not have sustained the injury.") (punctuation omitted).

a broad sense that holding Chaz further would have foreclosed all other outcomes outside the hospital, whether they were benign or harmful, but it does not demonstrate that releasing him proximately caused this outcome.[15] There is no expert testimony or other evidence that explains what actually caused Chaz's drowning death. It is undisputed that Chaz was able to swim, and it was warm summer weather when he drowned — there is nothing unreasonably dangerous about swimming in July in Georgia. The experts understandably conceded that they lacked sufficient information to be able to form any specific conclusion about what caused Chaz to drown.[16] In this way, this case is different from others in which a suicidal mental health patient died by suicide.

---

[15] See generally *Morris v. Baxter*, 225 Ga. App. 186, 187 (483 SE2d 650) (1997) ("The natural and probable consequences are those which human foresight can foresee, because they happen so frequently that they may be expected to happen again. The possible consequences are those which happen so infrequently that they are not expected to happen again.").

[16] See, e.g., *Everson v. Phoebe Sumter Med. Center, Inc.*, 341 Ga. App. 182 (798 SE2d 667) (2017) (denial of summary judgment) reversed in part by *Jordan v. Everson*, 302 Ga. 364 (806 SE2d 533) (2017); *Peterson v. Reeves*, 315 Ga. App. 370 (727 SE2d 171) (2012) (denial of summary judgment); *Purcell v. Breese*, 250 Ga. App. 472 (552 SE2d 865) (2001) (denial of summary judgment); *Brandvain v. Ridgeview Institute, Inc.*, 188 Ga. App. 106 (372 SE2d 265) (1988) (denial of directed verdict).

Further, there is no evidence that Chaz was physically impaired or unsafe to walk on his own. And the fact that Chaz was stopped and *not detained* by law enforcement on July 16 further demonstrates that the causal chain between his discharge and his death was too remote to demonstrate proximate cause. Unfortunately, we are left only with assumptions that are based on speculation about the circumstances causing Chaz's death. This is insufficient to overcome a summary judgment motion.[17]

As noted above, "[t]he requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery."[18] Despite the tragic outcome of the events, in light of the interval of time and events between Chaz's discharge and his death, the undisputed record here fails to support an inference that the alleged negligence proximately

---

[17] See *Southwestern Emergency Physicians, P.C. v. Quinney*, 347 Ga. App. 410, 427 (4) (819 SE2d 696) (2018) ("assumptions based on speculation are not evidence") (punctuation omitted).

[18] (Punctuation omitted.) *Johnson*, 311 Ga. at 593. See also *Atlanta Obstetrics & Gynecology Group*, 260 Ga. at 569 ("[P]roximate cause is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent.") (punctuation omitted).

caused Chaz's death. Therefore, the trial court correctly granted the defendants'

motion for summary judgment.

*Judgment affirmed. Gobeil, J., concurs.  Senior Judge C. Andrew Fuller, dissents.*

A23A1715. FERGUSON et al v. BOWERS et al.

FULLER, Senior Judge.

As the Supreme Court has made clear, "what amounts to proximate cause is undeniably a jury question, it will be determined by the court as a matter of law in plain and undisputed cases." *Atlanta Obstetrics & Gynecology Group v. Coleman*, 260 Ga. 569, 570 (398 SE2d 16) (1990) (citation and punctuation omitted). This is not a plain and undisputed case. Under the facts of this case, a jury would be authorized to

find both that the defendants deviated from the standard of care and that their conduct put in motion the events that led to Chaz's death. Accordingly, I dissent.

"To impose liability for medical malpractice, a plaintiff must show three things: (1) the duty inherent in a professional-patient relationship; (2) breach of that duty by deviating from the appropriate standard of care; and (3) a showing that the failure to exercise the requisite degree of skill is the proximate cause of the injury sustained." *Breyne v. Potter*, 258 Ga. App. 728, 729 (2) (574 SE2d 916) (2002) (citation and punctuation omitted). The sole issue presented is whether the defendants' conduct proximately caused Chaz's death. In this regard, "[p]roximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Peterson v. Reeves*, 315 Ga. App. 370, 376 (3) (727 SE2d 171) (2012) (citation and punctuation omitted).

There is some evidence from which a jury could determine that the doctors' premature discharge of Chaz proximately caused his death. The evidence shows that Chaz was a known flight risk. Indeed, his running away during a psychotic episode is what led to his involuntary commitment. Certainly, it should have been foreseeable to the defendants that, given the chance, he might run again. Granted, there is no way the doctors could have known that Chaz would drown. But the law does not require

that the exact injury be foreseeable. See *Sawtell Partners, LLC v. Visy Recycling, Inc.*, 277 Ga. App. 563, 565 (2) (627 SE2d 58) (2006). Rather, the relevant inquiry is whether the doctors should have anticipated that some harm might result. See *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 115 (3) (b) (372 SE2d 265) (1988).

As noted by the majority, the record shows that Chaz died by accidental drowning. And "[t]he danger of drowning in water is a palpable and manifest peril, the knowledge of which is chargeable to the decedent in the absence of a showing of want of ordinary capacity." *Harmon v. City of College Park*, 218 Ga. App. 136, 137 (460 SE2d 554) (1995) (citation and punctuation omitted). Thus, a swimmer's decision to enter the water will generally be considered the sole proximate cause of a death by drowning. See *Sayed v. Azizullah*, 238 Ga. App. 642, 644 (519 SE2d 732) (1999). Here, however, there is some evidence of a "want of ordinary capacity." According to Dr. Wasser, Chaz was "actively psychotic" and "was not able to attend to his own safety[.]" Likewise, Dr. Lutz testified that Chaz lacked the capacity to care for himself. And one who is bereft of reason is not chargeable with diligence. See *Emory Univ. v. Lee*, 97 Ga. App. 680, 702 (6) (104 SE2d 234) (1958). Under the facts of this case, I do not believe the fact that Chaz died by accidental drowning insulates the defendants from liability as a matter of law.

I also disagree with the majority's conclusion that "we are left only with assumptions that are based on speculation about the circumstances causing Chaz's death." Although we may not know exactly what led up to Chaz's drowning, the law does not require concrete evidence as to what exactly occurred. See *Sampson v. Med. Center, Inc.*, 369 Ga. App. 627, 631 (894 SE2d 198) (2023). An expert rendering an opinion may rely on circumstantial evidence to support his theory of proximate causation. See id. Again, both defense experts testified that, given Chaz's active psychosis, he was unable to attend to his own safety and that his premature discharge led to his death. Under these circumstances, a genuine issue of fact exists as to whether Dr. Bowers' and Dr. Currier's actions in releasing Chaz were a proximate cause of his death. See *Evans v. Med. Center of Central Ga.*, 359 Ga. App. 797, 800-801 (860 SE2d 100) (2021).

Finally, I do not believe that Chaz's interaction with the deputy after he left the hospital grounds constituted an intervening cause that broke the chain of causation. Where the independent act of a third party produces the injury, the intervening act "should be treated as the proximate cause, insulating and excluding the negligence of the defendant." *Johnson v. Avis Rent A Car System*, 311 Ga. 588, 593 (858 SE2d 23) (2021) (citation and punctuation omitted). "[F]or any intervening act to become the

sole proximate cause . . . the act must not have been foreseeable by defendant, must not have been triggered by defendant's act, and must have been sufficient by itself to cause the injury." *Suzuki Motor of America, Inc. v. Johns*, 351 Ga. App. 186, 192 (2) (a) (830 SE2d 549) (2019) (citation and punctuation omitted). The alleged intervening act is the deputy's *failure* to detain Chaz. Assuming that the failure to act can constitute an intervening cause, I cannot agree that, as a matter of law, the deputy's failure to detain Chaz constituted an intervening cause that was sufficient to insulate the defendants from liability. Rather, this issue must be resolved by a jury. See id at 192-193 (2) (a); *Vann v. Finley*, 313 Ga. App. 153, 163 (2) (721 SE2d 156) (2011).

Because the Fergusons have presented evidence from which a jury could conclude that the defendants proximately caused Chaz's death, the trial court erred in granting summary judgment. See *Evans*, 359 Ga. App. at 800-801 (finding a jury issue existed in a medical malpractice action based on expert testimony that a premature discharge from the hospital without adequate testing proximately caused subsequent death). Therefore, I dissent.