SIXTH DIVISION
March 16, 2007

No. 1-05-2126

| | | |
|---|---|---|
| MICHELLE WILLIAMS, Individually and as | ) | Appeal from the |
| Special Administrator of the Estate of BABY DOE, | ) | Circuit Court of |
| Deceased, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 03 L 000863 |
| | ) | |
| JOHN C. MANCHESTER, | ) | Honorable |
| | ) | Jennifer Duncan-Brice, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This is an appeal pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) by plaintiff, Michelle Williams, individually, and as special administrator of the estate of Baby Doe, from the grant of summary judgment, on certain counts of her complaint for her own and Baby Doe's personal injuries, to defendant, John C. Manchester. Specifically, Williams contends that the circuit court erred when it granted summary judgment to Manchester on her claim under the Wrongful Death Act (740 ILCS 180/1 (West 2002)) for Baby Doe's death which came about after she terminated her pregnancy as a result, she contends, of injuries Manchester caused. Williams further contends that the court erred in granting summary judgment to Manchester on her claim for Baby Doe under the Survival Act (755 ILCS 5/27-6 (West 2002)). For the following reasons, we reverse the grant of summary judgment to Manchester on the wrongful death count, but affirm the grant of summary judgment on the survival count.

1-05-2126

## FACTUAL BACKGROUND

On January 22, 2003, Williams filed a three-count complaint in the circuit court. The complaint alleged that she was a passenger in a car struck by Manchester's car on October 15, 2002, at the intersection of Montrose and Western Avenues in Chicago. Among other acts of negligence causing the collision, plaintiff alleged that Manchester failed to yield the right-of-way and turned left in front of the car in which Williams rode when it was unsafe to do so. In the first count of the complaint, Williams sought recovery for her own injuries on account of Manchester's alleged negligence. In the second count, Williams alleged that she was carrying a child who ultimately died as a result of the collision caused by Manchester and sought to recover for her child's wrongful death as administrator of Baby Doe's estate. Finally, in the third count, Williams, pleading for herself and Baby Doe, sought recovery for Manchester's alleged negligent infliction of emotional distress. As shall be more fully discussed below, Williams subsequently added a fourth count alleging the right of Baby Doe to recover for injuries he/she sustained before his/her death under the Survival Act.

Manchester, subsequently, filed an answer denying all pertinent allegations. He further filed a third-party complaint alleging that Michelle Popec, the driver of the car in which Williams was a passenger, caused the collision through her own negligent driving. Popec, in turn, answered Manchester's complaint, denying all pertinent allegations.

Manchester ultimately filed a motion for partial summary judgment attacking Williams' wrongful death and negligent infliction of emotional distress counts on November 29, 2004. In the motion, he argued that no wrongful death action for Baby Doe could lie because it was not

his negligence that was the proximate cause of its death. Manchester contended:

> "Neither the car accident, x-rays nor any other potential risks to the fetus was the proximate cause of the fetus' death. Rather, it resulted from Plaintiff's voluntary decision to undergo [an] abortion procedure. *** Plaintiff elected to have an abortion so that she could undergo a course of medical treatment for her own benefit. Plaintiff elected of her own volition to proceed with*** hip surgery despite being provided options that would have allowed her to postpone surgery and forego termination of the pregnancy."

Manchester argued that Williams' negligent infliction of emotional distress claim must also fail for lack of causation, and that, further, she could present no proof of actionable emotional distress since she never sought treatment for that alleged distress.

Williams countered that, but for medical considerations stemming from Manchester's negligence, she would not have terminated the pregnancy, making his negligence the cause-in-fact of Baby Doe's death. Williams disputed that, under the circumstances of increased medical risks to Baby Doe and herself in maintaining the pregnancy, her abortion could be characterized as "elective." Williams further argued that the termination of the pregnancy was a reasonably foreseeable result of his negligently causing the collision, which would establish his negligence as the proximate cause of Baby Doe's death.

In their summary judgment pleadings, both parties relied on the depositions, taken in discovery, of Williams and Dr. James Keller to support their respective positions. Those

depositions revealed the following pertinent facts.

In her deposition, Williams testified that she suffered a fractured pelvis and hip in the crash and was taken for treatment to Illinois Masonic Hospital. She was three months pregnant at the time. She was not married to the child's father, and the pregnancy was unplanned.

At the hospital, three doctors "convinced [her]" that electing to abort her child was the right thing to do under the circumstances, though the baby itself was unharmed in the collision. Dr. Kirby, an emergency room physician, Dr. Beigler, an orthopedic surgeon, and Dr. George, an obstetrician-gynecologist, informed her that, because her pelvic bone was fractured, they could not be certain that she could maintain the pregnancy. If she did choose to remain pregnant, she would have to be bedridden. Her bones would heal, but would possibly have to be rebroken and reset after delivery. In that event, "[t]hey couldn't promise that [she] would ever walk right." The doctors also told her that the X-rays taken of her in the emergency room could cause "disabilities in the child and mental problems." She "took [the doctors' statements] as [meaning that] the best thing to do [was to] have [an] abortion and let them do *** surgery [on her fracture]." No one counseled her against having an abortion. Williams underwent an abortion and Dr. Beigler subsequently successfully performed surgery on her pelvis.

Williams testified that she was not influenced to undergo an abortion by nonmedical factors. Prior to the crash, she had started to prepare for the baby's arrival, purchasing a bumper set and baby clothes. She cried "a lot" in the hospital, including around the time she underwent the abortion.

Dr. James Keller, a high-risk obstetrician-gynecologist, also gave a deposition in the case.

Dr. Keller testified that he met Williams during his rounds at Illinois Masonic and consulted on her care, but did not actually provide any treatment. As a consulting physician, he was "[t]o make sure that [Williams] had as much information as possible, [and] to make sure that the orthopedic surgeon understood the relevant issues, so that they could make a decision as to what the best course of action would be." The Illinois Masonic doctors' counseling of Williams was to be non-judgmental, meaning only to allow "the patient [to have] the information to make a decision," not to advise her as to what decision she should make. Dr. Keller explained that "our overall goal [was] to be as nonguiding as possible."

According to Dr. Keller, at the time he consulted on her care, Williams had a viable pregnancy that could have gone to term. He explained, however:

> "[T]o the fetus there[] [was] the risk of [Williams'] drug and radiation exposure prior to this point; to the mother there[] [was] an increase of prolonged immobilization with a pelvic fracture which carried short-term and long-term risks. The short-term risks would be mainly an increased risk of embolic phenomenon, thrombosis and embolism, blood clots. The long-term risks *** they said that the longer that she waited to repair the hip the worse her outcome would be."

Respecting the fetus' exposure to radiation, Dr. Keller testified that there was "no known safe threshold for radiation exposure to a fetus." He acceded, however, that it was not a "forgone conclusion" that Baby Doe would have experienced difficulties due to his/her radiation exposure and that "[w]ith any individual fetus you won't be able to say, well, this is what would happen

1-05-2126

with this fetus." Dr. Keller could not quantify the increased risk to Baby Doe due to radiation exposure, nor could he quantify the amount of radiation Baby Doe was exposed to, though he testified that such quantification was possible through consultation with a physicist and geneticist. He stated, however, that there was "theoretically enough radiation [in this case] to cause a problem," citing to studies in which third-trimester fetuses experienced increased risks of childhood leukemia after only limited exposure to radiation. Moreover, had Williams elected to delay the surgery and to continue the pregnancy, she would have exposed Baby Doe to additional radiation through her ongoing treatment. Speaking generally, Dr. Keller identified the risks of fetal radiation exposure to be the incorrect development of organs and "childhood and adulthood malignancies."

At one point in his deposition, defense counsel asked Dr. Keller to decipher his consultation notes. In one note, Dr. Keller recorded "Patient would like to continue pregnancy but not at risk to her long-term outcome." In another, he wrote:

"Spoke with attending ortho. There is no guarantee of good outcome regardless of immediate surgery, delayed second trimester surgery, or expectant management. However, immediate surgery offers best chance for good long-term outcome.

Options are termination of pregnancy with immediate surgery after recovery, delay until second trimester which would decrease risk to fetus of drug radiation exposure, or immediate surgery with fetus at risk for both loss as well as long-term problems due to radiation/medicine which would

-6-

be difficult to quantify.

> Long discussion with patient and father of the baby.  They understand all issues.  I will put through PEC papers."

Dr. Keller explained that "PEC" referred to the hospital's perinatal ethics committee.  The health care system of which Illinois Masonic was a part had a policy not to perform elective abortions.  The hospital would only perform abortions when there was "significant risk" to either the child or mother.

The circuit court granted the motion for summary judgment as to the wrongful death count, but denied the motion as to the negligent infliction of emotional distress count, in a written order, on March 11, 2005.  With respect to the wrongful death count, the circuit court stated:

> "[B]ased on the express language of the Wrongful Death Act, Plaintiff cannot maintain a cause of action on behalf of her fetus.  In establishing proximate cause, the Act does not take into consideration the reasonable foreseeability of an injury or death, but, rather focuses primarily on whether a defendant's conduct actually caused the injury or death.  Here, the evidence establishes that, subsequent to the car accident, Plaintiff's fetus was uninjured and viable.  Thus, Plaintiff could have continued with the pregnancy.  However, rather than continue with the pregnancy and wait until later to address her own injuries, Plaintiff chose to receive medical treatment at the sacrifice of her fetus, thereby, terminating her pregnancy."

1-05-2126

The court certified its order as appropriate for interlocutory appeal under Supreme Court Rule 304(a). 155 Ill. 2d R. 304(a).

On March 24, 2005, Williams moved the circuit court to reconsider its grant of summary judgment on the wrongful death count and further moved to file an amended complaint. In an order entered that same day, the circuit court granted Williams leave to file the amended pleading and indicated that it would either deny the motion for reconsideration or advise defendant to respond at the next status date of April 11, 2005. The court further ordered that "Plaintiff's time in which to file a notice of appeal pursuant to Rule 304(a) stays until the Court rules on Plaintiff's reconsideration."

On March 28, Williams filed a proposed fourth count of her complaint under the Survival Act on behalf of Baby Doe. The new count alleged that, on account of Manchester's negligence, Baby Doe "suffered severe and permanent bodily injuries including radiation and medication exposure prior to *** death."

The only action taken at the April 11 status hearing was to continue the matter until April 13, 2005. At that time, the court denied Williams' motion for reconsideration and "indicated [that Rule] 304(a) language will be granted pending the outcome of defendant Ma[n]chester's motion for summary judgment on count IV, and therefore [this court] retains jurisdiction."

Manchester subsequently moved for summary judgment on the new survival count on May 4, 2005. Manchester argued that Baby Doe, as an unborn person, was not a "person" as contemplated by the Survival Act. Moreover, Manchester argued that Williams' claim that Baby Doe suffered injury was "purely speculative." Williams responded that Illinois law recognized

the creation of an increased risk of future injury as compensable in damages. She further contended that Illinois, generally, recognized the right of fetuses to be born free from harm and that, therefore, Baby Doe should be considered a "person" under the Act. In support of her claim, Williams relied on Dr. Keller's testimony, as well as the averments "[b]ased on a reasonable degree of radiological certainty" contained in the attached affidavit of Dr. Mark Edelman, a board-certified radiologist. Dr. Edelman averred that "the radiation exposure the fetus was subjected to, prior to the pregnancy termination as a consequence of the injuries she had sustained in the automobile collision, produced an increased risk of future injury to the fetus, specifically, neural tube deformity." Dr. Edelman further gave his opinion "that as a consequence of the radiation exposure to Michelle Williams' fetus prior to the termination, and given the fact that the pregnancy was in its first trimester, the fetus was damaged in that it sustained *** an increased risk of future neural tube deformity." Manchester replied that finding risk of future injuries compensable under the Survival Act would run contrary to the Act's purpose of compensating for actual injuries suffered prior to death.

The circuit court granted Manchester's motion for summary judgment on the Survival Act count on June 6, 2005. The circuit court ruled that fetuses were not considered persons under the Act. The court further ruled that any potential future injury was speculative in this case, and, in any event, could not be considered an injury under the Act, since the Act was meant to address actual *antemortem* injuries causing pain and suffering. The court further ruled that Williams provided no evidence of Baby Doe being conscious of and experiencing any pain and suffering. Finally, the court ordered "Rule 304(a) language is entered as to count IV (Survival Act) and

counts II and III (wrongful death and negligent infliction of emotional distress). (Counts II and III respectively granted & denied per previous orders and continued until ruling on Count IV)."

On June 14, 2005, Manchester moved the court to modify its previous orders of March 11 and June 6 *nunc pro tunc* to include specific language indicating that the court had made the specific findings required for interlocutory appeal under the rule, rather than merely referring to Rule 304(a). The circuit court ultimately entered an agreed order to that effect on June 14, 2005. However, only two days later, the court struck its June 14 order and further stated that the "March 11 and June 6, 2005 orders are final as of June 6, 2005. The court finds no just reason to delay enforcement or appeal of the orders, with the time for Plaintiff to file an appeal pursuant to Supreme Court Rule 304(a) on both orders beginning to run on June 6, 2005."

On June 27, 2005, Williams filed an "Emergency Motion to Correct Order of April 13, 2005." That motion stated:

> "1. On March 11, 2004 the Court granted Defendant's Motion for Summary Judgment as to Count II of Plaintiff's Complaint. The court entered a 6 page typed order detailing its ruling, and a one page order written by the counsel for Defendant granting Supreme Court Rule 304(a) language. ***
>
> 2. Subsequently, Plaintiff filed a Motion for Reconsideration which was denied on April 13, 2005. ***. At that time the Court indicated that it would stay the entry of Supreme Court 304(a) language as to its Order of Summary Judgment as to Count II until after the Defendant's

Motion for Summary Judgment as to Cou[n]t IV was decided so as to avoid a piecemeal appeal.

3. The Order entered on April 13, 2005 was incompletely written and stated : 'that the court has indicated that [Rule] 304(a) language will be granted pending the outcome of Defendant Manchester's Motion for Summary Judgment on Count IV and therefore retains jurisdiction.' ***.

4. The court['s] and [the] parties['] intentions were to stay Supreme Court Rule 304(a) language until all of the motions were resolved on June 6, 2005. *** To effectuate this, the April 13, 2005 Order should have contained language striking the Supreme Court Rule 304(a) language from the handwritten March 11, 2005 Order but did not.

WHEREFORE, Plaintiff request[s] the Court [to] enter an Order *nunc pro tunc* correcting the April 13, 2005 Order to include the following: 'The Supreme Court [Rule] 304(a) language from the Court's Order of March 11, 2004 is hereby stricken.' "

The circuit court granted the order.

The following day, June 28, 2005, Williams filed her notice of appeal. In the notice, Williams stated that she was appealing from the order "entered on March 11, 2005 made final and appealable by order dated June 16, 2005," the "order entered on April 13, 2004, corrected *nunc pro tunc* on June 27, 2005," and the "order entered on June 6, 2005."

ANALYSIS

1-05-2126

On appeal, Williams contends that "[b]ut for [Manchester's] negligence [she] would not have been forced to undergo a termination [of her pregnancy]. And that it is reasonably foreseeable that negligence which results in injury to a pregnant woman may result in the forced termination of her unborn child." She further argues that her decision to abort was foreseeable in light of injuries to Baby Doe, specifically radiation exposure from X-rays, occurring as a result of Manchester's negligence. With respect to the survival count, Williams contends that fetuses, such as Baby Doe, are "persons" under the Survival Act and that Baby Doe's potential for future injury was cognizable under the Act. Williams, thus, contends that the summary judgments granted to Manchester were erroneous. Manchester, on the other hand, contends that summary judgment was proper on the wrongful death count because, as a matter of law, it was Williams' voluntary decision to undergo an abortion that was the proximate cause of Baby Doe's death, not his negligence. Manchester further contends that summary judgment was also appropriate for the survival action because Baby Doe was not a person as contemplated by the Survival Act and because there was no proof of any pain and suffering to Baby Doe prior to death.

Before we address these substantive contentions, however, we perceive the need to first determine our jurisdiction over this matter with respect to the timeliness of this appeal. See Department of Public Aid v. Lekberg, 295 Ill. App. 3d 1067, 1069 (1998) ("[W]e have an independent duty to ensure our jurisdiction is proper"); see also O'Donnell v. Sears, Roebuck & Co., 71 Ill. App. 3d 1, 5-6 (1979) ("None of the parties have raised the jurisdiction of this court as an issue. However, the parties cannot confer jurisdiction where none exists").

A. Jurisdiction

-12-

1-05-2126

We raised the question of our jurisdiction over this matter at oral argument, noting our concern about the timeliness of the notice of appeal from the challenge to the summary judgment granted against the wrongful death count in light of Williams' emergency motion on June 27 which sought to have the April 13 order modified *nunc pro tunc* to specifically strike the circuit court's Rule 304(a) finding in the March 11 order. The filing of this emergency motion suggested that Williams herself was concerned that the 30-day deadline for filing her notice of appeal might have started on March 11 and that she might have missed that deadline. At oral argument, the parties both asserted that this court had jurisdiction and agreed to file a joint supplemental brief in support of our jurisdiction. We received the parties' joint submission, and after reviewing their brief and conducting our own review, we are now satisfied that our jurisdiction is properly grounded.

Supreme Court Rule 304(a) provides:

> "If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." 155 Ill. 2d R. 304(a).

In the event of such an express written finding from the circuit court, the "time for filing a notice of appeal shall be as provided in Rule 303." 155 Ill. 2d R. 304(a). Rule 303, barring entry of a posttrial motion, provides a window of 30 days in which to file a notice of appeal; in the event of the filling of a posttrial motion within those initial 30 days, the time for filing a notice of appeal

-13-

1-05-2126

is expanded to 30 days beyond the ruling on the posttrial motion. 210 Ill. 2d R. 303(a)(1). See also Greer v. Yellow Cab Co., 221 Ill. App. 3d 908, 913 (1991) ("The trial court *** erred in its belief that upon entry of a proper 304(a) finding it would be divested of its jurisdiction to hear the motion for reconsideration [timely filed within 30 days of the finding]"); Stroud v. News Group Chicago, Inc., 215 Ill. App. 3d 1006, 1010 (1991) ("After a trial court has entered a Rule 304(a) finding that there is no just reason to delay enforcement or appeal of a final judgment *and the time to appeal has expired*, the court loses jurisdiction to modify the order" (emphasis added)).

Thus, Williams' filing of her motion to reconsider the grant of summary judgment on the wrongful death count, filed on March 24, 2005, 13 days after the March 11 order granting summary judgment and including Rule 304(a) language, tolled the time for filing a notice of appeal until the determination of that reconsideration motion and preserved the circuit court's ability to modify its original order. At the time the circuit court ruled on the motion to reconsider, April 13, 2005, the court evinced its desire to change the appealability of the grant of summary judgment on the wrongful death count by stating in its order that "[Rule] 304(a) language will be granted pending the outcome of defendant Ma[n]chester's motion for summary judgment on count IV, and therefore [this court] retains jurisdiction." This was a change within the circuit court's power to make since it still had jurisdiction over its prior order. See, e.g., Zekman v. Direct American Marketers, Inc., 182 Ill. 2d 359, 367 (1998), and Edward E. Gillen Co. v. City of Lake Forest, 221 Ill. App. 3d 5, 10 (1991) (wherein the reviewing courts noted without criticism or comment that the circuit court vacated previously entered Rule 304(a)

-14-

language and subsequently reviewed the orders after they became final under Rule 303). Hence, the April 13 order itself, as originally written, was sufficient to vacate the circuit court's previous Rule 304(a) finding on March 11. The *nunc pro tunc* elimination of the March 11 Rule 304(a) finding, through the June 27 emergency motion, was not actually necessary to ensure that the 30 days for filing a notice of appeal was not counted from March 11.

The 30-day period for filing Williams' notice of appeal, at the earliest, would have commenced with the entry of the order granting summary judgment to Manchester on the survival count on June 6, 2005, which also stated "Rule 304(a) language is entered as to count IV (Survival Act) and counts II and III (wrongful death and negligent infliction of emotional distress)." The circuit court then appropriately modified its previous order to include the required specific "appealability" language in its June 14 order. See In re Application of the DuPage County Collector, 152 Ill. 2d 545 (1992). Williams notice of appeal, filed on June 28, was obviously within 30 days of the entry of the June 14 order. Therefore, the notice was timely and properly conferred jurisdiction on this court. We turn, then, to the merits of the appeal.

### B. The Merits: Wrongful Death

Summary judgment should be granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and the "party is entitled to judgment as a matter of law." 735 ILCS 5/3-1005(c) (West 2002). However, "[S]ummary judgment is a drastic measure and should only be granted [when] the moving party's right to judgment is clear and free from doubt." Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102 (1992). Thus, all evidence before a court

considering a summary judgment motion must be considered in the light most favorable to the nonmoving party. In re Estate of Hoover, 155 Ill. 2d 402, 410-11 (1993).

The court's function in resolving a summary judgment motion is not to try factual disputes, but merely to determine if any material factual disputes exist. Gilbert v. Sycamore Municipal Hospital, 156 Ill. 2d 511, 517 (1993). Summary judgment should be denied not only if there are disputed facts, however, but also if reasonable people could draw different inferences from the undisputed facts. Wood v. National Liability & Fire Insurance Co., 324 Ill. App. 3d 583, 585 (2001).

We review grants of summary judgment de novo. Espinoza v. Elgin, Joliet & Eastern Ry. Co., 165 Ill. 2d 107, 113 (1995). The movant bears the initial burden of production in a motion for summary judgment. Williams v. Covenant Medical Center, 316 Ill. App. 3d 682, 689 (2000). A defendant moving for summary judgment may meet its burden of production either by presenting evidence that, left unrebutted, would entitle it to judgment as a matter of law or by demonstrating that the plaintiff will be unable to prove an element of its cause of action. Williams, 316 Ill. App. 3d at 688. Until the defendant supplies facts that would demonstrate its entitlement to judgment as a matter of law, the plaintiff may rely on the pleadings to create questions of material fact. Williams, 316 Ill. App. 3d at 688. However, should a defendant present such facts, the burden then shifts to the plaintiff to present some evidence allowing the imposition of liability on the defendant and supporting each element of his cause of action, thereby defining a material issue of fact to be determined at trial. Williams, 316 Ill. App. 3d at 688; Wortel v. Somerset Industries, Inc., 331 Ill. App. 3d 895, 899-900 (2002); Garcia v. Nelson,

1-05-2126

326 Ill. App. 3d 33, 38 (2001).

The Wrongful Death Act provides:

> "Whenever the death of a person shall be caused by wrongful act,
> neglect or default, and the act, neglect or default is such as would, if death
> had not ensued, have entitled the party injured to maintain an action and
> recover damages in respect thereof, then and in every such case the person
> who or company or corporation which would have been liable if death had
> not ensued, shall be liable to an action for damages, notwithstanding the
> death of the person injured ***." 740 ILCS 180/1 (West 2002).

The "purpose of the [Wrongful Death] Act is to compensate the surviving spouse and next of kin for the pecuniary losses sustained due to the decedent's death." Beetle v. Wal-Mart Associates, Inc., 326 Ill. App. 3d 528, 532 (2001). See also Foster v. Kanuri, 241 Ill. App. 3d 677, 681 (1992) ("The legislative intent of the Wrongful Death Act is that the claims brought are those of the individual beneficiaries. The claim under the survival statute is that of the deceased which arose during his life and survived his death"). Aside from the additional element of the occurrence of death, the elements of a wrongful death claim are identical to those of a common law negligence claim. Compare Leavitt v. Farwell Tower Ltd. Partnership, 252 Ill. App. 3d 260, 264 (1993) ("In order to maintain a claim under the Act, plaintiff must demonstrate: (1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act"), with Behrens v. Harrah's Illinois Corp., 366 Ill. App. 3d 1154, 1156

-17-

(2006) ("To properly plead an action based in negligence, plaintiff must allege facts sufficient to establish that defendant owed a duty of care to plaintiff, that defendant breached that duty, and that the breach was the proximate cause of plaintiff's injuries"); see also Beetle, 326 Ill. App. 3d at 540 (Bowman, J., dissenting) ("A wrongful death action requires proof of the same elements-duty, breach of the duty, proximate cause and damages-as a common law negligence action, a classic action in tort").

The parties concur that the primary issue in the case before us is grounded in established tort principles surrounding proximate cause. Specifically, the parties agree that the primary issue presented in this case is whether a party's negligence causing injury to a pregnant woman may make it foreseeable that she will decide to undergo an abortion to facilitate her own medical treatment, so that the original tortfeasor will be the proximate cause of the fetus' death, or if the woman's decision to abort becomes a superceding cause of the fetus' death thereby relieving the original tortfeasor of liability for the fetus' death. Though the case involves an abortion, a medical procedure that can invoke controversial moral, philosophical, and political considerations of theology, philosophy, morality, privacy, and public policy, since the actions taken by Williams were legal and medically endorsed, it is agreed that the right of plaintiff to recover should be determined by general principles of proximate cause as applied with respect to intervening human agencies. As the defendant Manchester states in his brief: "It must be clearly understood that [he] in no way suggests any moral issue here with the option Williams elected to take. This discussion instead focuses entirely upon the legal issue of proximate cause of the death of the fetus, and the validity of a wrongful death claim against [him] under the

circumstances."

"Proximate cause 'is one which produces the injury through a natural and continuous sequence of events unbroken by any effective intervening cause.' " Cannon v. Commonwealth Edison Co., 250 Ill. App. 3d 379, 381 (1993), quoting Novander v. City of Morris, 181 Ill. App. 3d 1076, 1078 (1989). "Proximate cause" contains two elements: "cause in fact" and "legal cause." Young v. Bryco Arms, 213 Ill. 2d 433, 446 (2004). Cause in fact is determined by analyzing "whether the injury would have occurred absent the defendant's conduct." Young, 213 Ill. 2d at 446. Legal cause is a question "of public policy-how far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" Young, 213 Ill. 2d at 446. See also McCraw v. Cegielski, 287 Ill. App. 3d 871, 873 (1996) ("Proximate cause requires the plaintiff to show that the defendant's negligence was (1) the actual cause or the cause in fact of his injury, i.e., but for the defendant's conduct, the accident would not have occurred; and (2) the legal cause of his injury, i.e., the defendant's conduct was so closely tied to the plaintiff's injury that he should be held legally responsible for it"). Generally, the "proper inquiry regarding legal cause involves an assessment of foreseeability, *** whether the injury is of a type that a reasonable person would see as a likely result of his conduct." Young, 213 Ill. 2d at 446-47. See also Restatement (Second) of Torts §435(2) (1965) ("The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm").

There may be more than one cause of an injury. See Nelson v. Union Wire Rope Corp.,

-19-

31 Ill. 2d 69, 88 (1964) ("it is fundamental in the law of negligence that there may be more than one proximate cause of injury"); Jefferson v. City of Chicago, 269 Ill. App. 3d 672, 676 (1995) ("Once it is said that the 'causal connection' may be unbroken, a jury can consider that there may be more than one proximate cause of an injury").  For liability to attach, it is sufficient if a tortfeasor is *a* cause of injury, or, put differently, a substantial factor in causing the injury.  See Young, 213 Ill. 2d at 446 (holding that if "there are multiple factors that may have combined to cause the injury, [a defendant may be a cause in fact of the injury if his] conduct was a material element and a substantial factor in bringing about the injury"); Nelson, 31 Ill. 2d at 88 ("one is liable for its negligent conduct whether it contributed in whole or in part to the plaintiff's injury, so long as it was one of the proximate causes of injury"); McClure v. Hoopeston Gas & Electric Co., 303 Ill. 89, 104 (1922) ("The negligence of the defendant *** is the proximate cause [of injury] *** if it can be properly said to have produced the result complained of, in natural and continuous sequence, unbroken by any efficient intervening cause"); Seith v. Commonwealth Electric Co., 241 Ill. 252, 259 (1909) ("The negligent act or omission must be the cause which produces the injury, but it need not be the sole cause, nor the last or nearest cause.  It is sufficient if it concurs with some other cause acting at the same time, which, in combination with it, causes the injury, or if it sets in motion a chain of circumstances, and operates on them in a continuous sequence, unbroken by any new or independent cause"); see also Pullman Palace Car Co. v. Laack, 143 Ill. 242, 260 (1892) ("If *** the wrong of appellant put in motion the destructive agency, and the result is directly attributable thereto, and there was no intervention of a new force or power of itself sufficient to stand as the cause of the mischief, the negligence of appellant

must be considered the proximate cause of the injury, if it could have been foreseen, by the exercise of ordinary care, that injury might or would result from the negligence").

A tortfeasor may cease to be the proximate cause of injury based on an intervening cause. See Bentley v. Saunemin Township, 83 Ill. 2d 10, 15 (1980) ("The negligence of a defendant will not constitute a proximate cause of a plaintiff's injuries if some intervening act supersedes the defendant's negligence"); Elliott v. Williams, 347 Ill. App. 3d 109, 113 (2004) ("The negligence of a defendant will not constitute a proximate cause of a plaintiff's injuries if some intervening act supercedes the defendant's negligence"). " 'An intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury, and itself becomes the direct and immediate-that is, the proximate-cause of an injury.' " Laack, 143 Ill. at 261, quoting J. Bishop, Bishop on Non-Contract Law, §§ 42, 835, 836 (1889).

However, it has long been settled that "not every intervening act sufficiently insulates the initial wrongdoer from liability. The causal connection is not broken by such an act if the intervening act was itself foreseeable by the first wrongdoer." Baylie v. Swift & Co., 27 Ill. App. 3d 1031, 1046 (1975). Accord Felty v. New Berlin Transit, Inc., 71 Ill. 2d 126, 131 (1978) ("A foreseeable intervening force does not break the chain of legal causation"); see also Easley v. Apollo Detective Agency, Inc., 69 Ill. App. 3d 920, 938 (1979) (quoting the Restatement (Second) of Torts §442 (1965) in holding that to determine whether an intervening force was also a superceding cause courts should consider " '(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary

rather than normal in view of the circumstances existing at the time of its operation; (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion' ").

The degree of foreseeability required for liability to attach to a defendant has been characterized simply to require that the resulting harm be "natural," in retrospect, in the context of the risk created by the tortfeasor's wrongdoing. As our supreme court observed in Siemieniec v. Lutheran General Hospital, 117 Ill. 2d 230, 259 (1987):

> "The general rule of damages in a tort action is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated. Remote, contingent, or speculative damages do not fall within this general rule."

Or, as Professors Prosser and Keeton noted:

> "The number and variety of causes which may intervene, after the negligence of the defendant is an accomplished fact, are obviously without

any limit whatever.  In the effort to hold the defendant's liability within some reasonable bounds, the courts have been compelled, out of sheer necessity and in default of anything better, to fall back upon the scope of the original foreseeable risk which the defendant has created.  The question is always one of whether the defendant is to be relieved of responsibility, and the defendant's liability superseded, by the subsequent event.  In general, this has been determined by asking whether the intervention of the later cause is a significant part of the risk involved in the defendant's conduct, or is so reasonably connected with it that the responsibility should not be terminated.  It is therefore said that the defendant is to be held liable if, but only if, the intervening cause is 'foreseeable.'

But here *** this overworked and undefined word covers a multitude of sins.  It is at least clear that in many cases recovery has been allowed where the intervening cause was not one which any reasonable actor could be expected to anticipate or have in mind, but it is regarded as 'normal' to the situation which the actor has created.  In other words, although the theory of the cases is one of foreseeability, a considerable element of hindsight may have entered into its practical application." W. Keeton, Prosser & Keeton on Torts §44, at 302-03 (5th ed. 1984).

See also Felty, 71 Ill. 2d at 131 ("It is not necessary *** that the precise nature of the intervening

cause be foreseen"); accord <u>Seith</u>, 241 Ill. at 259 (holding that, to be foreseeable to the first wrongdoer, the "precise form of the injury" does not need to be foreseen; rather "when it occurs, it must appear that it was a natural and probable consequence of his negligence"); Restatement (Second) of Torts §443 (1965) ("The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bring about"); Prosser & Keeton on Torts §44, at 306-07 ("It is perhaps a pointless quibble over the meaning of a term to debate whether such normal intervening causes are to be called 'foreseeable.' They are at least foreseeable in the sense that any event which is not abnormal may reasonably be expected to occur now and then, and would be recognized as not highly unlikely if it did suggest itself to the actor's mind. They are closely and reasonably associated with the immediate consequences of the defendant's act, and form a normal part of its aftermath; and to that extent they are not foreign to the scope of the risk created by the original negligence. For the most part they have been called foreseeable by the courts; but that word obviously has traveled a long way from its original meaning in connection with the risk created by negligence").

Courts and commentators have recognized victims' attempts to escape the danger the defendant put them in as a natural consequence of a defendant's original negligence. See Prosser & Keeton on Torts §44, at 307 ("Thus defensive acts, such as the reasonable attempt of an individual threatened with harm to escape it, as by leaping from a vehicle or swerving aside will not relieve the original wrongdoer of liability, whether the act be instinctive or after time for reflection, and whether the resulting injury is to the person so seeking to escape, or to another");

Restatement (Second) of Torts §445 (1965) ( "If the actor's negligent conduct threatens harm to another's person, land, or chattels, the normal efforts of the other or a third person to avert the threatened harm are not a superseding cause of harm resulting from such efforts"); Restatement (Second) of Torts §446 ("If the actor intentionally or negligently impedes the exercise of another's rights or privileges, the other's normal efforts to remove the impediment or to exercise the right or privilege notwithstanding its existence are not a superseding cause of harm resulting from such efforts").  It is further recognized as foreseeable that parties responding to the risks created and harms inflicted by the original tortfeasor may be negligent in their responses and may also, in turn, harm third parties.  See Lange v. Missouri Pacific Railway Co., 208 Mo. 458, 106 S.W. 660 (1907) (affirming a judgment for the plaintiff where, in an attempt to avoid a train's steam blown onto a passenger platform, she stepped onto a set of tracks in front of another, moving traincar); Restatement (Second) of Torts §443, Reporters Notes, Comment c, at 473 ("In order that the reaction of human beings to the stimulus of a situation be normal it is not necessary that the situation be such as to make it justifiable or reasonable"); Restatement (Second) of Torts §445, Reporter's Notes, Comment a, at 475 (stating that the rule that the normal efforts of another to avert the harm caused by a defendant are not a superseding cause of harm "applies *** also where the harm is sustained by a third person who is attempting to avert the threatened harm, *or, who, being in the neighborhood, is harmed by the efforts made to avert it*" (emphasis added)); Restatement (Second) of Torts §446 & Reporter's Notes, Comment a, at 477 (stating that the rule that the normal efforts to remove a defendant's impediment to another's "exercise [of] the right or privilege notwithstanding its existence are not a superseding cause of harm resulting from such

efforts" "applies not only when the person whose right or privilege is impeded injures himself in his efforts to remove the impediment or exercise his right or privilege notwithstanding its existence, but also when his efforts result in harm to third persons"); 2 J. Mirza, Illinois Personal Injury §203.29, at 233 (1996) ("Minor negligence in the intervening conduct of the third party is always regarded as foreseeable on the part of the initial tortfeasor so as to invariably prevent that intervening conduct from being regarded as an 'effective' superceding cause").

Granted, however, an initial tortfeasor may be relieved from liability in the event that another party, responding to the original danger created, acts wantonly, maliciously, or so negligently himself that he becomes the proximate cause. See Herzog v. Lexington Township, 167 Ill. 2d 288, 299 (1995) (holding that even if a municipality had breached a duty to a plaintiff-motorist to adequately mark a curvy section of a road and to post a safe speed limit through the curves, that judgment for the municipality would have been correct based on the jury's determination that the plaintiff was the sole proximate cause of his own one car crash); Fox v. Travis Realty Co., 262 Ill. App. 3d 1071, 1075 (1994) ("If, however, Fox's injuries are more than 50% attributable to [negligence in] his own rescue efforts [to save himself], he shall be barred from recovering"); Wagner v. International Railway Co., 232 N.Y. 176, 180, 133 N.E. 437, 437-38 (1921) ("Danger invites rescue. *** The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. His is accountable as if he had"); Prosser & Keeton on Torts §44, at 317-18 ("Yet there are other cases in which it seems equally clear that the defendant should not be liable. What if A knocks B down and leaves B lying unconscious in the street, where B may be run over

by negligently driven automobiles, and C, a personal enemy of B, discovers B there and intentionally runs B down? When the defendant excavates a hole in the sidewalk into which someone might fall, the defendant may be liable if the plaintiff is negligently pushed into it by a stranger, but what if the plaintiff is pushed deliberately?")

Keeping these general principles in mind, we now turn to examine more factually analogous cases and the facts presented in the case at bar.

The parties' and our own research reveals only one case expressly permitting recovery to a mother for the wrongful death of her unborn child subsequent to an abortion where the abortion was a consequence of a tortfeasor's preceding negligence: Shirley v. Bacon, 154 Ga. App. 203, 267 S.E.2d 809 (1980). However, this case appears factually close to the case at bar and we find it persuasive.

In Shirley, as in this case, a pregnant passenger was injured in an automobile collision. The plaintiff-passenger subsequently underwent what was described as a "therapeutic abortion" based on both the injuries she received in the crash, as well the multiple pelvic X-rays she received in the course of treating those injuries. Shirley, 154 Ga. App. at 203-04, 267 S.E.2d at 810. After determining that summary judgment was improperly granted to the defendants on the assumption that the fetus was not viable at the time of the collision (Shirley, 154 Ga. App. at 203-04, 267 S.E.2d at 810-11), the Shirley court went on to address whether it was of any import that the plaintiff's child's death came about, at least in part, through the abortion. With a limited qualification, the court concluded that the abortion did not preclude the mother's recovery, stating: "the fact that the 'homicide' in question occurred at the time of the therapeutic abortion

does not preclude [plaintiff] from maintaining this action if the trior [*sic*] of fact concludes that said abortion was necessitated because of injuries sustained as a result of the negligence of [defendants]." Shirley, 154 Ga. App. at 204, 267 S.E.2d at 811. See also Rottman v. Krabloonik, Inc., 834 F.Supp. 1269 (D. Colo. 1993) (denying the defendant-restaurant's and meat suppliers' motions to dismiss an expectant mother's wrongful death claim where she underwent an abortion following a parasitic infestation, allegedly from the ingestion of defendant's tainted meat, that injured herself and her unborn child, without specifically addressing the effect of the abortion on its ruling); Coveleski v. Bubnis, 535 Pa. 166, 634 A.2d 608 (1993) (precluding wrongful death recovery, where a woman terminated her pregnancy due to risks of fetal injury from a negligently caused car crash, only because the eight-week-old fetus was not yet capable of independent existence outside of the mother and was, therefore, not a "person" under Pennsylvania's wrongful death act); McGeehan v. Parke-Davis, 573 So. 2d 376, 377 (Fla. App. 1991) (reversing a summary judgment for defendants, where the plaintiff terminated her pregnancy after receiving a prescription for and ingesting drugs capable of producing birth defects, without warning of that risk, for a condition she did not, in fact, have and stating: "in legal contemplation, an unborn fetus is not a person for the wrongful death of whom a tortfeasor is liable to its survivors for damages under the Wrongful Death Act[;] . . . therefore, it is living tissue of the body of the mother for the negligent or intentional tortious injury to which the mother has a legal cause of action the same as she has for a wrongful injury to any other part of her body").

Moreover, applying the same general principles previously discussed, a number of foreign

courts have held that it should have been foreseeable to a tortfeasor that his negligent actions might lead to a pregnant woman deciding to terminate her pregnancy for medical reasons. See Bendar v. Rosen, 247 N.J. Super. 219, 588 A.2d 1264 (1991), Deutsch v. Shein, 597 S.W.2d 141 (Ky. 1980); Lynch v. Bay Ridge Obstetrical & Gynecological Associates, P.C., 72 N.Y.2d 632, 532 N.E.2d 1239 (1988). Each of these cases, thus, allowed the woman to be compensated for her injuries from the loss of the fetus, or in being put to the choice of whether to maintain or terminate her pregnancy.[1]

---

[1] We note that Bendar and Lynch, at least, might have been meritorious wrongful death cases but for the nonrecognition of unborn fetuses as "persons" or "decedents" under their states' wrongful death acts. See Giardina v. Bennett, 111 N.J. 412, 545 A.2d 139 (1988); Endresz v. Friedberg, 24 N.Y.2d 478, 248 N.E.2d 901, 301 N.Y.S.2d 65 (1969) (requiring a live birth to support a wrongful death claim, but also allowing parental recovery for, among other injuries, emotional distress in the event of a stillbirth caused by negligence); accord McGeehan v. Parke-Davis, 573 So. 2d 376, 377 (Fla. App. 1991). We further note that there is no similar problem under Illinois' Wrongful Death Act, however, as the statute specifically includes unborn fetuses as "persons" for whom survivors may recover. See 740 ILCS 180/2.2 (West 2002) ("The state of gestation or development of a human being when an injury is caused, when an injury takes effect, or at death, shall not foreclose maintenance of any cause of action under the law of this State arising from the death of a human being caused by wrongful act, neglect or default"); see also 720 ILCS 510/1 (West 2002) ("Without in any way restricting the right of privacy of a woman or the right of a woman to an abortion under [United States Supreme Court] decisions, the General

1-05-2126

In Bendar, the plaintiff was a passenger in a car that collided with another. As a result of injuries from the collision, the plaintiff received five X-rays, which were performed without a pelvic shield. The plaintiff subsequently found out that she was pregnant, in spite of a sterilization procedure her gynecologist was previously to have performed. In light of the risks of radiation to the fetus' well being, the fact that she would have to undergo a uterine stitch operation if she carried the child to term, as well as financial considerations, the plaintiff elected to abort her pregnancy. The plaintiff subsequently claimed negligence against the drivers involved in the crash and a medical malpractice claim against her former gynecologist. After a verdict in favor of the plaintiff, all of the defendants appealed. Bendar, 247 N.J. Super. at 224-27, 588 A.2d at 1267-68. Like in the instant case, the driver-defendants asserted that their negligence could not have proximately caused the plaintiff's emotional injuries stemming from her decision to have an abortion. More specifically, they contended that factors unrelated to the crash, such as the necessity of another uterine stitch if she carried the child to term, caused the plaintiff to decide to abort; they further argued that they could not have reasonably foreseen that the plaintiff would undergo X-rays while unaware that she was pregnant. Bendar, 247 N.J. Super. at 229-30, 588 A.2d at 1269-70.

The Bendar court rejected the driver-defendants' arguments, however. The court

_____

Assembly of the State of Illinois do solemnly declare and find in reaffirmation of the longstanding policy of this State, that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this State").

-30-

observed that "[t]o be a proximate cause *** conduct need only be a cause which sets off a foreseeable sequence of consequences, unbroken by any superseding cause, and which is a substantial factor in producing the particular injury" and that "[t]he tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective 'realm of foreseeability.' " Bendar, 247 N.J. Super. at 229, 588 A.2d at 1269. Then, with respect to the plaintiff's consideration of factors outside of the crash in deciding to terminate her pregnancy, the court held:

> "[Defendants] point out that [the plaintiff] had even said that some of her reasons for undergoing the abortion were the identical reasons that she expressed for having the original tubal ligation, namely the economics of raising another child, having to undergo the uterine stitch, and having had three difficult pregnancies. If this were all that plaintiff had stated, the automobile defendants might have a valid argument. But plaintiff specifically testified that a significant consideration in her decision was the danger that the [X]-rays had deformed the fetus. In fact, she stated that the [X]-rays were 'one of the major things' which influenced her decision. While causation certainly remained a fact issue, the jury could properly have resolved it against the automobile defendants." (Emphasis added). Bendar, 247 N.J. Super. at 230, 588 A.2d at 1269-70.

Surrounding the defendants' claim that they could not have foreseen that the plaintiff would have undergone X-rays while unaware she was pregnant, the court noted with approval that the trial

-31-

judge instructed the jury " 'that it is foreseeable ... that a person who is involved in an automobile accident will require medical treatment, including [X]-rays'" and that if the jury decided that the exposure to X-rays " 'was a proximate cause of the plaintiff's decision to have her pregnancy terminated, then ... the termination ... and associated injuries are foreseeable consequences of the negligence of the [automobile] defendants." Bendar, 247 N.J. Super. at 231, 588 A.2d at 1270.

In Deutsch v. Shein, an internist ordered multiple diagnostic X-rays performed on the plaintiff when she reported to him with various symptoms including nausea and weakness. Prior to ordering the X-rays, the doctor failed to test the plaintiff for pregnancy, however, and she was, in fact, pregnant at the time. The plaintiff's obstetrician/gynecologist determined there was a serious risk of damage to the fetus and, in the event the plaintiff decided to have an abortion, he recommended that it be performed within a week. The plaintiff's pediatrician, similarly, did not counsel her as to whether she should have an abortion but did inform her that the procedure was "medically indicated." The plaintiff went on to terminate her pregnancy and to sue her internist for malpractice. At trial, the internist presented expert testimony that the amount of radiation exposure did not, in fact, warrant a therapeutic abortion. The jury hearing the case determined that the doctor breached his duty of care in failing to administer a pregnancy test, but also concluded that the breach was not the proximate cause of the plaintiff's injuries. The Deutsch court disagreed, however, and remanded for a new trial. Deutsch, 597 S.W.2d at 142-43. The court held:

> "[W]hether the medical opinions Mrs. Deutsch received represented
>
> correct medical advice is of no import. Dr. Shein failed to adhere to the

applicable standard of care and his negligence was a substantial factor in causing Mrs. Deutsch to be irradiated while preganant. As a result, she sought medical advice about her condition. Neither doctor consulted advised her to have an abortion performed, but both were of the opinion that the extent of radiation she received would have dire consequences upon the developing fetus and upon Mrs. Deutsch's emotional health. Having put Mrs. Deutsch in a position from which it was reasonable to seek the medical services of other doctors, Dr. Shein is responsible for any injury to her resulting from her exposure to the risk involved in these medical services." Deutsch, 597 S.W.2d at 145.

Finally, the Court of Appeals of New York declined to find a plaintiff's abortion to be a superceding cause over the defendant's negligence in Lynch v. Bay Ridge Obstetrical & Gynecological Associates, P.C., 72 N.Y.2d 632, 532 N.E.2d 1239 (1988). According to her complaint, the Lynch plaintiff reported to her gynecologist after she had not menstruated for three months, but her home pregnancy tests also came back negative. After exclusively performing a visual examination, her doctor informed the plaintiff that she was not pregnant and prescribed her the drug Provera. When she filled the prescription, the label on the packaging and the pharmacist informed the plaintiff, for the first time, that ingestion of Provera in early pregnancy created a serious risk of birth defects. The plaintiff took the medication anyway, however, since her doctor had told her that she was not pregnant. When she continued to miss her period, the plaintiff reported to another gynecologist. The second doctor performed

laboratory tests that revealed that the plaintiff was actually pregnant. This doctor also counseled the plaintiff on the risks posed by her use of Provera. Based on her fear that her fetus had been harmed, the plaintiff and her husband decided to terminate the pregnancy. The plaintiff claimed physical and emotional injuries as a result of the abortion and from having to decide to undergo the procedure. The trial court, however, dismissed the complaint for failure to state a claim. Lynch, 72 N.Y.2d at 634-35, 532 N.E.2d at 1240. In reversing the dismissal and rejecting the defendant's claim that the plaintiff's personal decision to have an abortion constituted a superceding cause, the Lynch court explained:

"There is, we conclude, a factual question presented here: whether, under the circumstances, it could reasonably be expected that plaintiff, upon discovering that she had taken the drug in the mistaken belief that she was not pregnant, would elect to undergo an abortion.

*** [T]he general rule is that an intervening act which is a normal consequence of the situation created by a defendant cannot constitute a superseding cause absolving the defendant from liability [citation]. Thus, a reasonable attempt to avoid the danger created by a defendant's conduct- an action that should certainly be considered a 'normal consequence' of that conduct-cannot amount to a superceding act which breaks the chain of causation. [Citations.] *** [I]t is apparent that plaintiff's 'choice' to have an abortion cannot be said to be, as a matter of law, a superseding cause. As the complaint alleges, the physician's negligent diagnosis and treatment

1-05-2126

were the precipitating causes of all that followed; but for the gynecologist's

conduct, plaintiff would not have been in the position of having to choose

between two objectionable alternatives: undergo an abortion or risk

having a baby with serious birth defects. That plaintiff made the very

choice forced upon her by defendants' negligence cannot insulate them

from legal responsibility for such conduct." Lynch, 72 N.Y.2d at 636-37,

532 N.E.2d at 1241-42.

See also In re Alice D., 113 Misc. 2d 940, 949, 450 N.Y.S.2d 350, 356 (1982) ("Under the facts

in this case [where a man informed a woman that he was sterile when, in fact, he was not], it

would be incredible and intolerable to state that a woman who becomes pregnant against her

wishes and then aborts, has not been harmed. *** The fact that her choice of an abortion is

purely a personal one [citations], does not alter the fact that she has suffered harm resulting from

the conception, pregnancy, and subsequent abortion").

We fail to see why the rationale of these cases would not similarly apply under the facts

of the case at bar. At least some evidence before us suggests that Williams' decision to abort was

made based only on medical considerations, most specifically the effects on her own long-term

health if she did not terminate the pregnancy and undergo immediate pelvic surgery. There is

further evidence that these considerations only came about as a result of the alleged negligence of

Manchester in striking the car in which Williams rode.[2] Thus, Williams' decision to abort

---

[2] A private investigator for Williams took the recorded statement of Melissa Brazeau, a
waitress at Jerry's Grill, located on the southeast corner of Western and Montrose. Brazeau

-35-

appears "closely and reasonably associated with the immediate consequences of the defendant's act, and *** a normal part of its aftermath." Prosser & Keeton on Torts §44, at 307. Moreover, while this would not preclude a jury from considering the matter as a question of fact, we cannot agree that, as a matter of law, it would be unforeseeable that a pregnant woman, injured through a person's negligence would agree to endure the medical consequences to herself, or the fetus for that matter, regardless of their severity, simply for the sake of maintaining the pregnancy. See Coleman v. Windy City Balloon Port, Ltd., 160 Ill. App. 3d 408, 415 (1987) (" 'foreseeability' is a factor in both the court's duty determination-which is a question of law [citations]-and the jury's proximate cause determination, which ordinarily is a question of fact [citations]") This might be the reasonably foreseeable result where abortion is legally prohibited, but not where such intervention is lawful and available. See Farley v. Sartin, 195 W. Va. 671, 684, 466 S.E.2d 522, 535 (1995) ("By definition, if a woman has a constitutional right to decide whether to carry an unborn child to term or abort it, then the act of aborting is not tortious"); City of Missoula v. Asbury, 265 Mont. 14, 19, 873 P.2d 936, 938-39 (1994) ("Appellants' individual religious and moral beliefs are neither included in, nor relevant to, [the] statutory defenses [raised]"). The circuit court itself recognized the foreseeability of the termination in this case when, in refusing to dismiss Williams' negligent infliction of emotional distress count, it stated "a jury could find that it was reasonably foreseeable to expect that a pregnant woman who is injured in a motor

witnessed the crash on October 15, 2002. In her opinion, Manchester bore responsibility since he "did not yield to oncoming traffic and turned in front of this car."

vehicle accident would be forced to put her fetus at risk in order to have her own injuries treated."

Thus, we cannot find that Williams' decision to abort Baby Doe under these circumstances created can be deemed "highly extraordinary" (Restatement (Second) of Torts §435(2), at 449), so that her decision would be a superceding cause of Baby Doe's death in relation to Manchester's original alleged negligence. See Restatement (Second) of Torts §442A, Reporter's Notes, Comment b, at 469 ("Where the negligence of the actor has created the risk of harm to another because of the likelihood of such intervention, the actor is not relieved of responsibility merely because the risk which he has created has in fact been fulfilled").

Manchester would contend, however, that our result is contrary to the holding of the case of Light v. Proctor Community Hospital, 182 Ill. App. 3d 563 (1989). But, we disagree.

In Light, the plaintiff underwent a thyroid scan, subsequently found out that she was pregnant, and, on the advice of her radiologist, terminated her pregnancy. The circuit court granted the hospital's motion to dismiss the plaintiff's wrongful death complaint and the plaintiff appealed. Light, 182 Ill. App. 3d at 564-65. The Light court observed that the facts at bar called section 2.2 of the Wrongful Death Act into play, which stated:

> "There shall be no cause of action against a physician or a medical
>
> institution for the wrongful death of a fetus caused by an abortion where
>
> the abortion was permitted by law and the requisite consent was lawfully
>
> given. Provided, however, that a cause of action is not prohibited where
>
> the fetus is live-born, but subsequently dies." 740 ILCS 180/2.2 (West

1-05-2126

2002).

The court went on to conclude that the plain language of section 2.2 precluded the plaintiff's action because:

"While the plaintiff may have received substandard medical care at the time the thyroid scan was administered, the existence of her fetus was terminated as the result of her subsequent voluntarily consensual legal abortion. The consequence of the scanning procedure may have been a potential increase in risk to the well-being of the fetus. The result of the abortion procedure was the actual termination of the plaintiff's pregnancy." Light, 182 Ill. App. 3d at 566.

We note that in its abbreviated analysis, under two pages, the Light court exclusively provided authorities surrounding proper statutory construction. Light, 182 Ill. App. 3d at 565-66. The court never considered the possibility of concurrent causes or foreseeable intervening causes, nor cited to any authorities addressing proximate cause generally. The court concluded its analysis by stating, "In summary, we believe the subject provision of the Wrongful Death Act to be certain and unambiguous and this court would be unwarranted in broadening the statute's reach to embrace the set of facts at bar." Light, 182 Ill. App. 3d at 566. Thus, it appears clear that the specific strictures of section 2.2, not general tort principles, determined the result of the case. Of course, since this case does not involve a claim against a doctor or medical institution, section 2.2 has no bearing on the case at bar.[3]

_____

[3] As a result we are not called upon to consider the validity of the Light court's

1-05-2126

Manchester, however, still contends that the Georgia case of <u>Roseberry v. Brooks</u>, 218 Ga. App. 202, 461 S.E.2d 262 (1995), should persuade us to uphold the circuit court's grant of summary judgment to him. We, however, find the facts of <u>Roseberry</u> to be too far removed from those of the instant case to be of any value in reaching our determination.

In that case, Mrs. Roseberry reported for medical care and was ultimately diagnosed with terminal liver cancer by the defendant gastroenterologist. Prior to commencing diagnostic testing and treatment, which apparently included X-rays, the gastroenterologist did not perform a pregnancy test on her. Mrs. Roseberry's condition worsened to the point where her last hope of survival was through undergoing an experimental chemotherapy regimen. To qualify for the study, however, she would require drainage of her liver through a stent to reduce her bilirubin levels. During an ultrasound following placement of the stent, doctors discovered that she was roughly 21 weeks pregnant. The gastroenterologist, allegedly without consulting an obstetrician or perinatologist, informed Mrs. Roseberry that her fetus was "doomed" and counseled her to have an abortion, which she did. She died shortly thereafter of an infection that formed at the stent site. Mrs. Roseberry's estate presented evidence, however, that the pregnancy could have continued even after her death. The estate's and the doctor's experts agreed that the gastroenterologist's failing to initially perform a pregnancy test and failing to consult with obstetricians or perinatologists prior to recommending an abortion would have been deviations from the applicable standard of care. A jury awarded damages for the aborted child's wrongful death. <u>Roseberry</u>, 218 Ga. App. at 202-05, 461 S.E.2d at 263-265. However, the <u>Roseberry</u>

interpretation of that section of the Act.

court reversed. The Roseberry court noted undisputed trial evidence that Mrs. Roseberry elected to have the abortion because she could not qualify for the experimental chemotherapy study while pregnant. The court held that, since her decision to abort was, thus, wholly unrelated to any negligence by her doctors, her elective abortion was a superceding cause of injury to the child. Roseberry, 218 Ga. App. at 207, 461 S.E.2d at 267 .

In this case, unlike in Roseberry, as previously noted, there is evidence that Williams was uninfluenced in her decision to terminate the pregnancy by any factor other than medical considerations to which she would not have been subject but for Manchester's allegedly negligent driving. Manchester would attempt to diminish the import of the factual dissimilarity by asserting that Roseberry stated a categorical rule against recovery for a fetus' wrongful death after an abortion; however, that view has not even been maintained by Georgia's courts. See Breyne v. Potter, 258 Ga. App. 728, 730-31, 574 S.E.2d 916, 919 (2002) (explaining that in Roseberry the court "held that the termination performed for the purpose of obtaining experimental treatment was an intervening act that superseded any medical negligence by the defendant doctor that also caused the mother to terminate the pregnancy. [Citation.] Roseberry does not stand for the proposition that a patient's decision to terminate a pregnancy breaks the chain of proximate cause following a doctor's erroneous diagnosis on which the patient relied in making that decision"); see also Shirley, 154 Ga. App. at 205, 267 S.E.2d at 811 ("the fact that the 'homicide' in question occurred at the time of the therapeutic abortion does not preclude appellant from maintaining this action if the trior of fact concludes that said abortion was necessitated because of injuries sustained as a result of the negligence of appellees"). Hence, we are not dissuaded from our prior

analysis by Roseberry.

What we perceive in much of Manchester's argument is not so much a claim that Williams' claim was unforeseeable or not a normal consequence of his negligence, so much as a critique of the ultimate necessity and reasonableness of Williams' actions under the circumstances. Thus, Manchester repeatedly emphasizes that there were treatment options available that would have allowed Williams to carry Baby Doe to term. It, therefore, appears that Manchester is attempting to invoke the rule of avoidable consequences. See Clarkson v. Wright, 108 Ill. 2d 129, 132 (1985), quoting Prosser, Torts §65, at 422-23 (4th ed. 1971) (" 'Closely allied to the doctrine of contributory negligence is the rule of 'avoidable consequences,' which denies recovery for any damages which could have been avoided by reasonable conduct on the part of the plaintiff. Both rest upon the same fundamental policy of making recovery depend upon the plaintiff's proper care for the protection of his own interests, and both require of him only the standard of the reasonable man under the circumstances' "); 1 D. Dobbs, Torts §196, at 489 (2001) ("under the avoidable consequences rule for minimizing damages, the plaintiff is regarded as the sole proximate cause of damages suffered because she failed to mitigate damages once injury occurred. As to those damages, the plaintiff cannot recover at all"). We, however, disagree that this rule would have any application in the instant case. See Corlett v. Caserta, 204 Ill. App. 3d 403, 412 (1990) ("precedent does not support [Dr.] Caserta's proposed *per se* rule that the estate of a deceased patient who refused, on religious grounds, a reasonable life-saving medical treatment should be barred, as a matter of law, from all wrongful death recovery from the physician whose negligence necessitated the lifesaving medical procedure. Whether based

upon principles relating to mitigation of damages, comparative fault, or assumption of the risk, we do not believe that a patient's refusal to accept a reasonable medical treatment, suggested in an effort to alleviate the consequences of the physician's negligence, should serve to completely defeat the patient's recovery for those injuries proximately caused by the physician's negligent acts").

To begin, we would question whether Manchester could even challenge Williams' medical decision under the undisputed facts in this case. This court clarified in Hall v. Dumitru, 250 Ill. App. 3d 759, 765 (1993), that:

> "An exception to [the] general rule [requiring a patient to undergo reasonable mitigating medical treatment] exists with respect to surgical procedures as well as nonsurgical procedures which present a risk of enhanced or additional injury. *** [I]f the proposed treatment could result in an aggravation of the existing condition or the development of an additional condition of ill health, or if the prospect for improved health is slight, then there should be no *duty* to undergo the treatment. If the risk is clearly remote, the exception should not apply. But the risk need not be significant or even probable in order to trigger the exception.
>
> Once the grounds for the exception are established, it should be unnecessary for the patient to articulate the particular reason for choosing to forego the treatment since this is an *objective* test not a *subjective* one. It is not the place of the court or the jury to evaluate a patient's reasons for

declining surgery or treatment, if the risks are recognized." (Emphasis in original).

Thus, the Hall court held that its plaintiff could not be found to have unreasonably failed to mitigate her damages, resulting from complications surrounding pregnancies occurring after a botched tubal ligation, when she refused to undergo a second tubal ligation procedure prior to the pregnancies. Hall, 250 Ill. App. 3d at 766 ("It is apparent from the record that a tubal ligation surgery involves risks to a woman's life or member. [Citation.] Therefore, the plaintiff was under no duty to undergo the surgery to mitigate her damages, and the evidence on this issue was improperly admitted, and the argument was *** improperly allowed").

The holding of Hall would appear to preclude any finding that Williams was under a duty to carry Baby Doe to term or to otherwise delay hip surgery under the circumstances. Undisputed facts presented in discovery suggested that Williams would have been at significant risk of additional injuries if she delayed repair of her pelvic fractures. Williams testified in her deposition that her doctors told her that if she continued with her pregnancy the condition of her hip could deteriorate to the point where she might not walk properly again, even after corrective surgery. Dr. Keller testified in his deposition that leaving Williams' pelvic fracture untreated "carried short-term and long-term risks," including "embolic phenomenon, thrombosis and embolism, blood clots," as well as a potentially worse orthopedic outcome from the delayed hip repair. Dr. Keller further testified that the hospital's perinatal ethics committee approval of the abortion would only have occurred under its rules in the event of a "significant risk" to Williams or Baby Doe without the performance of the procedure. Manchester does not appear to directly

dispute that a delay in performing the surgery would have increased the risk to Williams. Rather, he merely points out that Dr. Keller is not an orthopedist, though his opinions were at least in part based on discussions with Williams' orthopedist; that there was no specific quantification of the increased risk, though, according to Dr. Keller, the hospital would only perform an abortion when there was a "significant risk"; and that Williams' orthopedist could not guarantee a good surgical outcome even if the hip repair was performed immediately.

Since it is undisputed that delaying surgery would have definitively increased the risk of lasting, disabling injury to Williams, it is not for Manchester or this court to second-guess her medical decision to terminate her pregnancy so that she could undergo surgery immediately. See Hall, 250 Ill. App. 3d at 765 ("if the proposed treatment could result in an aggravation of the existing condition or the development of an additional condition of ill health, or if the prospect for improved health is slight, then there should be no *duty* to undergo the treatment. * * * It is not the place of the court or the jury to evaluate a patient's reasons for declining surgery or treatment, if the risks are recognized").

Moreover, even if the Hall exception did not apply, we do not believe that Williams' decision to terminate her pregnancy in order to facilitate immediate hip surgery could be found to be so unreasonable that liability would be precluded as a matter of law. See Corlett, 204 Ill. App. 3d at 414 (holding that the reasonableness of a plaintiff-patient's medical decisions should be determined in light of "the gravity of plaintiff's original injury, the intrusiveness of the proposed medical procedure and its attendant risk of complications, the feasibility of alternative medical procedures, the expense of the proposed medical treatment, the likelihood of increased recovery

if the proposed medical procedure had been accepted by the plaintiff, and other relevant circumstances"). To begin, there is some evidence that physicians counseled Williams to terminate her pregnancy. This is at least one possible inference from Williams' deposition testimony that her doctors "convinced [her]" that she should have an abortion. It would be difficult to label Williams' decision as unreasonable if, in fact, she was only following medical advice. Manchester would contend, however, that this testimony should not be credited in light of Dr. Keller's testimony that the hospital's doctors' counseling was to be nonjudgmental. But, credibility determinations are inappropriate in summary judgment proceedings. The disparity between Williams' and Keller's descriptions of the nature of the advice given by the hospital staff, at the very least, would present a dispute of material fact to be resolved by the jury. Further, a jury could well find that Williams made a reasonable medical decision under the circumstances since her multiple hip fractures from the auto collision presented a serious condition (see Corlett, 204 Ill. App. 3d at 414), that required a near-immediate treatment decision (see Wong v. Richards, 10 Ill. App. 3d 514, 516 (1973) ("conduct must be judged not in light of what later events revealed might or could have been a better or a safer course of conduct, but against the standard of how a reasonable person would have reacted under the circumstances of the same sudden alarm"); Jensen v. East St. Louis Ry. Co., 202 Ill. App. 583, 588 (1916) ("The fact that after being put in sudden danger by appellant's negligence appellee was hurt by her own act, in attempting to escape from injury, does not necessarily charge her with contributory negligence, but leaves it a question for the jury to decide whether she acted as a reasonably prudent person might have done under the circumstances")).

1-05-2126

Likewise, even if Williams could not justify the abortion as a response to concerns about her own, personal safety, a strong argument could be made that summary judgment was inappropriate based on the extent to which Baby Doe's irradiation may have played a part in Williams' decision to abort. Manchester makes much of Dr. Keller's lack of expertise and specific testimony with respect to evaluating the exact amount of increased risk to Baby Doe based on his/her past irradiation and future radiation, in the event Williams had elected to delay surgery and maintain her pregnancy. However, the objective likelihood of injury to Baby Doe is not dispositive with respect to the reasonableness of Williams' action. What is relevant to the reasonableness of her conduct is her response to what doctors communicated to her regarding the effect of radiation on Baby Doe. The only evidence in the record as to what doctors told her comes from Williams herself who stated that doctors Kirby, Ebigler and George warned her that her x-rays could cause "disabilities in the child and mental problems." See Deutsch, 597 S.W.2d at 145 ("whether the medical opinions Mrs. Deutsch received represented correct medical advice is of no import. Dr. Shein['s] *** negligence was a substantial factor in causing Mrs. Deutsch to be irradiated while pregnant. As a result, she sought medical advice about her condition. Neither doctor consulted advised her to have an abortion performed, but both were of the opinion that the extent of radiation she received would have dire consequences upon the developing fetus and upon Mrs. Deutsch's emotional health. Having put Mrs. Deutsch in a position from which it was reasonable to seek the medical services of other doctors, Dr. Shein is responsible for any injury to her resulting from her exposure to the risk involved in these medical services"). Moreover, we note that we find no order closing discovery in the record and that neither party asserts that

-46-

discovery has closed and, finally, that Dr. Keller testified that a physicist and geneticist could provide a quantification of risk from irradiation. Hence, were there merit to Manchester's contention that such quantification of risk to the fetus was necessary to support the reasonableness of Williams' action, in the absence of the concern for her own, personal safety, there is no reason to think that she could never meet this burden at trial, so that summary judgment should have been granted.

The dissent takes issue with our result, however, contending that "[t]he fetus here was terminated as a result of Williams' legal voluntary consent to abort. There is no evidence in the record that the fetus was injured as a direct result of the car accident." Slip op. at 61. In requiring that the fetus must sustain a direct injury, the dissent would appear to argue that the Wrongful Death Act does not contemplate the extension of proximate cause to an initial tortfeasor where there is also an intervening act involved. In keeping with this perspective, the dissent suggests that since there was no direct injury to Baby Doe by Manchester in the accident, Baby Doe had no direct cause of action against him and, therefore, that Williams does not either, since her rights are derivative of Baby Doe's rights. With all due respect, this approach is unsustainable.

The dissent does not purport to challenge the principle that foreseeable intervening causes will not preclude recovery for injuries sustained as a result of the original tortfeasor's negligence. Nor can the dissent challenge that under certain circumstances voluntary abortions are foreseeable as a result of the conduct of the underlying tortfeasor. These circumstances would include a mother's decision to abort to avoid the risk of exacerbated physical injury to herself or

the child during the foreseeable course of treatment by the mother for the direct injuries which she alone sustained in the prior accident. See Shirley, 154 Ga. App. at 204, 267 S.E.2d at 811.

Yet, the dissent still insists that Baby Doe's death exclusively came about "as a result of Williams' legal voluntary consent to abort." Slip op. at 61. Necessarily, then, the dissent ignores the undisputed facts as they appear in the record to support that Manchester broke her pelvis, requiring that she choose between terminating the pregnancy and possible permanent personal injury, specifically, never walking properly again, if she delayed surgery in order to maintain the pregnancy. As pointed out, Williams testified in her deposition that her doctors told her that if she continued with her pregnancy that the condition of her hip could deteriorate to the point where she might not walk properly again, even after corrective surgery. And we, again, observe that Dr. Keller testified in his deposition that leaving Williams' pelvic fracture untreated "carried short-term and long-term risks," including "embolic phenomenon, thrombosis and embolism, blood clots," as well as a potentially worse orthopedic outcome from the delayed hip repair. See Shirley, 154 Ga. App. at 205, 267 S.E.2d at 811 ("the fact that the 'homicide' in question occurred at the time of the therapeutic abortion does not preclude appellant from maintaining this action if the trior [sic] of fact concludes that said abortion was necessitated because of injuries sustained as a result of the negligence of appellees"); accord Deutsch, 597 S.W.2d at 145.

Moreover, as previously noted, there is evidence in the record to allow a jury to conclude that it would have been foreseeable or normal for Williams to abort out of concern for the future health of Baby Doe, since Baby Doe had been irradiated in the course of treating Williams' injuries, and would be further irradiated, should Williams have elected to maintain the pregnancy

and delay surgery. The dissent repeats Manchester's argument that there is insufficient expert testimony to conclusively establish that Baby Doe had actually suffered injury at the point of Williams' decision to end the pregnancy. However, what is relevant toward establishing the reasonable foreseeability of Williams' conduct is what her doctors communicated to her regarding the effect of radiation on Baby Doe. According to Williams' undisputed testimony, her doctors, Kirby, Ebigler and George, warned her that her X-rays could cause "disabilities in the child and mental problems." She further testified that her doctors convinced her to abort on account, at least in part, of Baby Doe's irradiation. See Deutsch, 597 S.W.2d at 145 ("whether the medical opinions Mrs. Deutsch received represented correct medical advice is of no import. Dr. Shein['s] *** negligence was a substantial factor in causing Mrs. Deutsch to be irradiated while pregnant. As a result, she sought medical advice about her condition. Neither [subsequent] doctor consulted advised her to have an abortion performed, but both were of the opinion that the extent of radiation she received would have dire consequences upon the developing fetus and upon Mrs. Deutsch's emotional health. Having put Mrs. Deutsch in a position from which it was reasonable to seek the medical services of other doctors, Dr. Shein is responsible for any injury to her resulting from her exposure to the risk involved in these medical services").

Thus, there can be little question that under well-established proximate cause analysis the question of liability of the underlying tortfeasor for an ensuing abortion of fetus, at the very least, would remain an issue for a jury to determine and would not be susceptible to summary determination as a matter of law. See Coleman, 160 Ill. App. 3d at 415 (" 'foreseeability' is a

factor in both the court's duty determination-which is a question of law [citations]-and the jury's proximate cause determination, which ordinarily is a question of fact [citations]"). To avoid that result, the dissent apparently attempts, by judicial fiat, to disclaim conventional proximate cause analysis where there is an intervening human agency in cases involving the wrongful death of a fetus. The dissent suggests that the Wrongful Death Act will not allow recovery for the death of child incurred as a result of an elective abortion even though, apparently, it would permit the mother to recover for the personal injury she would sustain as a result of being forced to make that election. It reaches this conclusion by espousing that the Wrongful Death Act would require a direct injury to the fetus by the defendant and would not permit recovery for an injury resulting from an intervening act, however foreseeable or natural the intervention would be under the circumstances.

The dissent attempts to explain its novel "direct injury" theory by stating:

> "[T]he proximate cause analysis of the majority relies on a theory that the 'death' of the fetus is the 'injury' that supports the wrongful death cause of action. The analysis *** writes out of the Wrongful Death Act the requirement that there must have been an actionable injury to the fetus with recoverable damages that could have been maintained had death not intervened." Slip op. at 61-62.

The contention of a direct injury requirement is defeated, however, by the very language the dissent accedes to, specifically, that the beneficiary recovers where the decedent, had he survived, would have recovered. This language would make the mother's recovery subject to the

-50-

same proximate cause analysis that would have applied to the decedent if he had survived and brought the action in his own person. But, even more pointedly, this contention is entirely inconsistent with the dissent's suggestion that if the child had died *en ventre sa mere*, as a result of radiation incurred in the course of treatment for Williams' own injuries, wrongful death recovery would be permitted. Under that scenario, the injury to the child would not have been directly caused by the tortfeasor, but indirectly through the mother's consent to treatment and the doctors' administration of radiation. More overridingly, recovery under the Wrongful Death Act has repeatedly been permitted in cases involving intervening causes, even where the intervening cause has been the decedent him/herself (see Winger v. Franciscan Medical Center, 299 Ill. App. 3d 364, 374 (1998), quoting Cowan v. Doering, 215 N.J. Super. 484, 494-95, 522 A.2d 444, 449-50 (1987) (stating, in repudiating a line of earlier cases holding that a decedent's decision to suicide necessarily constituted a superceding intervening cause unless the decedent was wholly bereft of reason: " 'Where it is reasonably foreseeable that a patient by reason of his mental or emotional illness may attempt to injure himself, those in charge of his care owe a duty to safeguard him from his self-damaging potential. This duty contemplates the reasonably foreseeable occurrence of self-inflicted injury regardless of whether it is the product of the patient's volitional or negligent act' "); see also Hooper v. County of Cook, 366 Ill. App. 3d 1 (2006) (reversing and remanding for a new trial where the court did not issue a special interrogatory to the jury to answer whether the decedent's commission of suicide was foreseeable to his medical providers and the evidence previously adduced did not establish its foreseeability as a matter of law)), or a criminal actor (see Vaughn v. Granite City Steel Division of National

Steel Corp., 217 Ill. App. 3d 46 (1991) (holding an employer liable where the employer's negligently provided security, in its parking lot, facilitated the fatal shooting of an employee); Duncavage v. Allen, 147 Ill. App. 3d 88 (1986) (holding a landlord liable for his tenant's death, under the Act, where it was foreseeable that a criminal would invade an apartment and murder the tenant because of the decrepit state the landlord allowed the building to fall into and where there had been previous incidents of crime on the site)).

More generally, the dissent's interpolation of new proximate causation standards into the Act must be rejected because, simply put, the standards surrounding proximate causation in ordinary negligence cases have always applied in wrongful death cases, including the standards surrounding multiple and intervening causes. For example, in Vaughn v. Granite City Steel Division of National Steel Corp., 217 Ill. App. 3d 46 (1991), a wrongful death case involving an alleged negligent failure to provide security, this court stated:

"The correct standard to be applied in a wrongful death case such as this is succinctly stated in the case of Hare v. Foster G. McGaw Hospital, (1989) 192 Ill. App. 3d 1031, 549 N.E.2d 778. In Hare, Justice Jiganti characterized the causation question as follows:

'This cause is a wrongful death action based upon the alleged medical malpractice of the defendant, Dr. Labrador. In order to recover for wrongful death, the Wrongful Death Act requires the plaintiff to prove that the alleged negligence caused the death of the decedent. [Citation.] The Illinois Supreme Court

1-05-2126

has stated that to prove causation in a medical malpractice action,

the plaintiff must establish that it is more probably true than not

true that the negligence was a proximate cause of the injury.

[Citation.] To prove proximate cause, the plaintiff must establish

that the defendant's negligence was a cause in fact of the death.

[Citation.] If the death would have occurred even in the absence of

negligence, the negligence was not a cause in fact of the death.

The element of cause in fact need not be proved to a certainty.

Rather the evidence is sufficient if it affords the jury a reasonable

basis to conclude that the negligence was "probably" or "more

likely than not" a cause of the death. ***'

While Hare involved medical malpractice, *the same causation*

*analysis applies to the instant case because both cases were filed under*

*the Act*." (Emphasis added). Vaughn, 217 Ill. App. 3d at 54-55.

Further, in Heitz v. Hogan, 134 Ill. App. 3d 352, 362 (1985), this court held that the long

form of Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971) (hereinafter IPI Civil 2d)

("When I use the expression 'proximate cause' I mean [that] [a] [any] cause which, in natural or

probable sequence, produced the injury complained of. [It need not be the only cause, nor the last

or nearest cause. It is sufficient if it concurs with some other cause acting at the same time,

which in combination with it, causes the injury") should be given to juries in wrongful death

cases where two or more persons may have caused the injury. Finally, in Law v. Central Illinois

-53-

Public Service Co., 86 Ill. App. 3d 701, 707 (1980), we specifically approved, in a wrongful death case, of the provision of a jury instruction that addressed intervening causes and identified a pattern instruction on the subject available to the circuit court, specifically IPI Civil 2d No. 12.05 ("If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury").

Since the position of the dissent finds no justification under applicable proximate cause analysis, we can only surmise that, at its core, the dissent finds the inexorable result, that the mother cannot be precluded from recovery under the Wrongful Death Act for a reasonably foreseeable voluntary abortion induced by tortious acts of another, to be societally unacceptable and counterintuitive. Consequently, the dissent seeks to tie its rejection to prevailing public policy considerations, which the dissent quite openly seeks to invoke. This is, in all likelihood, geared to the notion that, unlike more conventional intervening cause cases, here, the mother is both the intervenor and the plaintiff seeking recovery. However, there is no analytical basis upon which to make Williams' dual status as the foreseeable or normal intervenor and as the beneficiary who recovers under the Act subject to sanction, nor to make her status fit into any category that could be developed into an affirmative defense. The mother in this case intervened because of the fractured pelvis she sustained as a result of the negligence of the underlying tortfeasor, Manchester. That negligence put her to a form of "Sophie's choice." See W. Styron, Sophie's Choice. Given the risks and alternatives communicated to her by her physicians, and the legality and availability of choice she made, the foreseeability of that choice must be

determined by a jury and not by a judge as a matter of law. See Mack v. Ford Motor Co., 283 Ill. App. 3d 52, 57 (1996) ("To escape liability, defendant must demonstrate that the intervening event was unforeseeable as a matter of law. [Citation.]   A foreseeable intervening force does not break the chain of legal causation. [Citations.]  Furthermore, the precise nature of the intervening cause need not be foreseen [citation], *and where varying inferences are possible, foreseeability is a question for the jury* [citation]" (emphasis added)); Robertson v. General Tire & Rubber Co., 123 Ill. App. 3d 11, 14 (1984) ("The extensive testimony of this experienced mechanical engineer, along with all the other evidence presented by the plaintiff, provided enough evidence for the issue of the existence of a duty and the issue of foreseeability to go to the jury").  Her act as the intervenor is neither negligent, illegal, nor otherwise subject to public policy restrictions. See Farley, 195 W. Va. at 684, 466 S.E.2d at 535 ("By definition, if a woman has a constitutional right to decide whether to carry an unborn child to term or abort it, then the act of aborting is not tortious"); Asbury, 265 Mont. at 19, 873 P.2d at 938-39 (1994) ("Appellants' individual religious and moral beliefs are neither included in, nor relevant to, [the] statutory defenses [raised]"); Hall, 250 Ill. App. 3d at 765 ("if the proposed treatment could result in an aggravation of the existing condition or the development of an additional condition of ill health, or if the prospect for improved health is slight, then there should be no *duty* to undergo the treatment.  * * *  It is not the place of the court or the jury to evaluate a patient's reasons for declining surgery or treatment, if the risks are recognized").

Finally, the dissent attempts to ascribe to our decision the patronizing characterization of it being driven by "compassion" or "humanity."  These terms suggest that we are attempting to

subvert our legal analysis to accommodate to our own sympathies. That characterization is unwarranted. Quite to the contrary, our conclusions are compelled by the proximate cause analysis which must be applied under the Act as well as at common law. The attempt by the dissent to avoid its consequences would therefore reflect a negative reaction to a result which, to its author, may well be counterintuitive. However, the result which must be reached here cannot draw on any extrinsic moral, political, or affective considerations, but can only be premised on established, applicable legal principles and analysis. The dissent cannot by mere rhetoric accomplish what remains only within the power of the legislature.

### C. The Merits: Survival Act

Finally, Williams contends that the circuit court erred when it granted Manchester summary judgment against her count brought under the Survival Act for Baby Doe's *antemortem* injuries. We disagree.

The "established purpose of the plain language of our Survival Act, *** is to compensate the estate of the decedent for the damages and injuries he suffered prior to death." National Bank of Bloomington v. Norfolk & Western Ry. Co., 73 Ill. 2d 160, 180 (1978). Williams argues that Baby Doe suffered a cognizable injury prior to death, in the form of an increased risk of future injury, an assertion we have already found to be problematic above. However, even if Williams were correct in her identification of an injury, she did not make below and does not presently make any attempt to show what *antemortem* damages Doe may have incurred therefrom. Williams' failure to address this issue is particularly perplexing in that the lack of evidence of damages was a crux of the circuit court's order granting summary judgment to Manchester on the

survival count. As the court said in <u>Franks v. North Shore Farms, Inc.</u>, 115 Ill. App. 2d 57, 65 (1969): "A legal injury is a wrongful act resulting in damages. As a general rule to constitute a valid cause of action, there must be both injury and damages. An action cannot be maintained for an injury without damage. Injuria absque damno does not constitute a cause of action." See also <u>Ellig v. Delnor Community Hospital</u>, 237 Ill. App. 3d 396, 401 (1992) ("A survival action allows for the recovery of damages for injuries sustained by the deceased up to the time of death"). Thus, by declining to even address Baby Doe's *antemortem* damages, Williams has given us no basis on which to find error in the circuit court's order granting summary judgment on her survival count.

### III. Conclusion

For all the foregoing reasons, we reverse in part and affirm in part, and remand the cause for further proceedings consistent with this order.

McNULTY,[4] J., concurs.


JUSTICE CAHILL, dissenting:

I respectfully disagree with the majority's position that a cause of action lies under the wrongful death statute under these facts or that the primary issue in this case "is grounded in

---

[4] Justice Ann Burke, who was a member of the original panel assigned to this appeal, has been elevated to the Illinois Supreme Court, and Justice Jill K. McNulty has been assigned to the panel in her place. Justice McNulty has read the briefs and record, and listened to the tape of the oral argument.

established tort principles surrounding proximate cause." Slip op. at 18. I believe we must decide, as a matter of law, whether the language of the Wrongful Death Act permits a cause of action based on the facts of this case. Two preliminary observations:

1)      "Statutes that are in derogation of the common law will be strictly construed and nothing will be read into such statutes by intendment or implication. Even if a statute is remedial in nature, if it is in derogation of the common law, it will be strictly construed when determining which persons come within its coverage. Thus, the meaning of a statute and the extent to which it changes the common law will not be extended beyond that which the language of the statute absolutely requires by its express terms or by necessary implication." Cherney v. Soldinger, 299 Ill. App. 3d 1066, 1072, 702 N.E.2d 231 (1998), citing In re W.W., 97 Ill. 2d 53, 57, 454 N.E.2d 207 (1983); Malfeo v. Larson, 208 Ill. App. 3d 418, 424, 567 N.E.2d 364 (1990).

2) "Even were we to speculatively agree with plaintiff's argument regarding the legislature's motive in enacting the statute, it is irrelevant. [Henry v. St. John's Hospital, 138 Ill. 2d 533, 542, 563 N.E.2d 410 (1990).] Our only function is to enforce the law as enacted, and we may not engraft new or different provisions onto the statute. In Ralston v. Plogger (1985), 132 Ill. App. 3d 90, 98, 476 N.E.2d 1378, the court found that superimposing comparative negligence onto section 2 of the Wrongful Death Act 'would plainly be a forbidden judicial amendment to the statute.' It would be incumbent upon the legislature itself to revise the Wrongful Death Act to make it more compatible with the emergent doctrine of comparative negligence."

Haist v. Wu, 235 Ill. App. 3d 799, 813, 601 N.E.2d 927 (1992).

My point in citing to these cases is to suggest that the legislature never contemplated a cause of action for wrongful death that would embrace the unborn. That we now have a body of law that invests a fetus with the rights attributable to persons after a live birth is unmistakable. But this does not alter my view that the Wrongful Death Act cannot support a cause of action based on the facts of this case.

The majority correctly transcribes the wrongful death statute. See slip op. at 17. Although the fetus here was a "person" within the meaning of the statute (see 740 ILCS 180/2.2 (West 2002); Seef v. Sutkus, 145 Ill. 2d 336, 338, 583 N.E.2d 510 (1991)), there can be no cause of action for wrongful death. Had the fetus not been aborted, there is no way of knowing under the facts of this case whether the fetus had suffered an actionable injury before death. The language of the statute is clear: a person may be held liable for the death of another only if the decedent would have had a direct cause of action against the wrongdoer had death not ensued. Kessinger v. Grefco, Inc., 251 Ill. App. 3d 980, 983-88, 623 N.E.2d 946 (1993).

> " '[T]he liability *** created [by the wrongful death statute] depends upon the condition that the deceased, at the time of his death, had he continued to live, would have had a right of action against the same person or persons for the injuries sustained. *If the deceased had no right of action at the time of his death, the personal representative has none under the* [*Wrongful Death Act*].' (Emphasis added.)" Kessinger, 251 Ill. App. 3d at 984, quoting Biddy v. Blue Bird Air Service, 374 Ill. 506, 513-14, 30 N.E.2d 14 (1940).

See also <u>Varelis v. Northwestern Memorial Hospital</u>, 167 Ill. 2d 449, 455, 657 N.E.2d 997 (1995); <u>Mooney v. City of Chicago</u>, 239 Ill. 414, 423, 88 N.E. 194 (1909).

The fetus here was terminated as a result of Williams' legal, voluntary consent to abort. There is no evidence in the record that the fetus was injured as a direct result of the car accident. The speculation of record that there was radiation injury to the fetus as a result of the emergency treatment to Williams was just that: speculation unsupported by expert testimony. Dr. Keller testified at his deposition that Williams had a viable pregnancy that could have gone full term. He testified, however, that there was a "risk" to the fetus due to radiation exposure. Although Dr. Keller cited studies performed on fetuses during the third trimester of pregnancy, he did not quantify the risk to the fetus here, which was only in the first trimester of development. Nor could he specifically identify the injury that the fetus might have suffered. "Although an expert may not guess, conjecture, or surmise as to a possible cause for the injury, an expert can testify in terms of possibilities or probabilities so long as the opinion is based on a reasonable degree of medical certainty." <u>Wojcik v. City of Chicago</u>, 299 Ill. App. 3d 964, 978, 702 N.E.2d 303 (1998). Nothing in this record indicates that physicians treating Williams testified or were prepared to testify that, based on a reasonable degree of medical certainty, the fetus had suffered an injury as a consequence of the accident or the hospital treatment of Williams that would give rise to a direct cause of action had death not ensued.

The majority's proximate cause analysis and conclusion that the negligence of Manchester can be causally linked to the abortion extends the reach of the wrongful death statute beyond its plain language. Put another way, the proximate cause analysis of the majority relies on a theory that the

"death" of the fetus is the "injury" that supports the wrongful death cause of action. The analysis, I respectfully submit, writes out of the Wrongful Death Act the requirement that there must have been an actionable injury to the fetus with recoverable damages that could have been maintained had death not intervened. That is the fault line I perceive in the scholarly analysis of the majority, and for that reason I respectfully dissent from this humane and compassionate opinion.

The public policy implications lurking below the surface in this case are also a matter of concern. If there is to be a cause of action in the name of the fetus based on this kind of case–an undesired but possibly prudent therapeutic abortion for the sake of the mother's heath–the scope of that action should be addressed by the legislature. I believe the order of the circuit court granting summary judgement to Manchester on Williams' wrongful death claim should be affirmed.